IN RE INTEREST OF S.L.P., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. B.P. AND L.P., APPELLANTS.

432 N.W.2d 826

Filed December 16, 1988.   No. 88-320.

Tom Dawson for appellant L.P.

Michael J. Elsken for appellant B.P.

James Elworth, Deputy Lancaster County Attorney, for appellee.

Bruce A. Carpenter, guardian ad litem for S.L.P.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The parents of S.L.P., a minor child, have appealed from the adjudication of the juvenile court terminating their parental rights. The father assigns as error that the State failed to prove by clear and convincing evidence that his mental illness will continue for a prolonged, indeterminate time so as to justify a finding that it is in the best interests of the minor that his parental rights be terminated. The mother raises the same complaint, plus alleging that Neb. Rev. Stat. § 43-292 (Reissue 1984) unconstitutionally deprives her of equal protection of the law. Each parent is represented by a separate attorney and each has a separate guardian ad litem, as does the minor child.

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, and is thus required to reach a conclusion independent of the trial court. However, where the evidence is in conflict, this court may consider and give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of D.C.*, 229 Neb. 359, 426 N.W.2d 541 (1988).

The father's appeal may nearly be rejected out of hand. In January of 1986, 8 months before the birth of the minor child, he severely assaulted his wife, the mother, causing her a severe fracture-dislocation of the left wrist, left elbow, and left hip; cuts underneath her chin; and a very large bruise on her left underarm. It was necessary that she undergo surgery to replace her hip and to insert a partial prosthetic elbow. She remains permanently disabled.

The father has a long history of violent behavior and mental illness. He has been diagnosed as schizophrenic, paranoid type. He has been confined almost continuously in one of the state regional centers since 1975. One of his physicians stated that he

is probably the most difficult patient he had seen in years, and has "some of the most severe and intractable delusions" that he has ever seen. He said that the father is "extremely dangerous to himself" and is "a constant danger to other people." The father is presently confined in the most restrictive, most secure ward in the regional center. His physician stated that under the very best of circumstances, it would be a *minimum* of 5 to 10 years before he would be ready to even leave the security unit for a less restrictive area of the regional center.

Section 43-292(5) provides that parental rights may be terminated when "[t]he parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period." The father does not contest the allegation that he is presently unable to discharge his parental responsibilities because of mental illness. His argument is that the State did not prove the second element, that is, that his mental illness will continue for a prolonged, indeterminate period.

The only evidence concerning the likelihood of the father's recovery, or even *improvement*, was that his prognosis was "extremely poor" and that it would be a minimum of 5 to 10 years before he was even transferred to a less restrictive ward within the regional center. The evidence fully supports the finding made by the juvenile court.

As to the mother, the record also confirms the finding made by the trial court. She has been diagnosed as a paranoid schizophrenic. She has been mentally ill since at least 1978, when she was hospitalized at the Norfolk Regional Center. While her psychiatrist now entertains some doubts about the paranoid schizophrenic label, he nevertheless firmly believes that she has a mental illness, namely, a psychotic disorder. Her other doctors agree that she is a schizophrenic, paranoid type.

The mother occasionally suffers from delusions and was, at least in 1987, "clearly nonfunctional." She has a history of crises, suicide threats, poor judgment, social skills difficulties, and chaotic and unsatisfactory relationships. Her illness is a "major psychiatric disorder" which is "chronic" and "long term."

After being taken to the hospital, she was delusional, hearing voices, and having hallucinations, and had "markedly impaired reality testing." The mother was then transferred to the Madonna care facility. Seven months later she left that facility, but returned a short time later, and then in the latter part of October 1986, she again left against medical advice.

Some 3 months later, the mother was taken to the Community Mental Health Center because she was unable to care for herself. Following surgery on her hip, she was transferred to the Lincoln Regional Center. At that time she was extremely suspicious, had a distinct body odor, was disheveled, had neglected herself, and felt that people were taking money from her. She had gone off her medication, her thinking was unclear, she was "grossly disorganized," her sentences did not make sense, and her emotions were inappropriate.

After 4 days of "stormy" treatment, she signed herself out, against medical advice. She collapsed in the street, and was brought back to the hospital within 2 hours. She then was admitted to Milder Manor, from which she attempted to run away after 3 or 4 weeks. Civil commitment proceedings were then initiated because she was jeopardizing her health, and she was placed in the Lincoln Regional Center, where she remained until April of 1987.

The mother then lived in her own apartment from April until November, when she was transported back to the regional center. At the time she was recommitted, she had been evicted from her apartment, but had refused to leave. She was extremely angry, loud, and hostile. She was also somewhat out of touch with reality.

For the most part, the mother has been unwilling to cooperate with attempts to treat her mental and physical problems. Her caseworker stated that she had thrown away her medications and refused to take them most of the time. She refused to keep her appointments with her physician or psychiatrist. She refused to accept help that was offered to her, and although her apartment during the time she lived there was unclean, she would not allow "chore services" to assist her.

Additionally, she was unwilling to complete court-ordered parenting classes and parenting assessment. The caseworker

testified that she "would have much, much trouble living independently and would need an enormous amount of support on an ongoing basis," although *if* she were to maintain her medication program, she could possibly, with assistance, live on her own. Her physicians were not that optimistic. One testified that she refuses to properly take her medications, and without them, she "regularly and demonstrably has decompensated to the point where she cannot take care of herself." Even if she were completely cooperative, took her medicines faithfully, kept her appointments, etc., none of which she had ever done, her psychiatrist said her functioning would be "marginal," and she could not function without substantial support from outside agencies. Even with total cooperation by the mother, that doctor stated that he would "have difficulty believing that she'll ever get to a level of being able to function on her own."

The mother's psychiatrist from the regional center stated that because of her mental illness, the mother is not able to care for small children. Even with complete cooperation, gradual progression through the steps with increasing levels of autonomy, looking after things for herself without a lot of external help, and close ties with supportive, helping persons, etc., it is "*possible*" that she would someday be able to care for a child. However, he said that would take a "substantial period of time," probably "years." At least six medical-type witnesses indicated that this was a hopeless case.

The evidence is abundant that the mother is now, and will be indefinitely, unable to care for a child. Furthermore, the evidence is clear that this inability is the result of her mental illness, notwithstanding that some of her disability is physical in nature. This all has been established by clear and convincing evidence.

It is true that, fortunately, neither the father nor the mother has had an opportunity to have this child in his or her care. Therefore, there is no evidence of any harm having as yet befallen the minor. However, a court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child. *In re Interest of S.P., N.P., and L.P.*, 221 Neb. 165, 375 N.W.2d 616 (1985). In termination of

parental rights cases, the primary consideration is the best interests of the juvenile. *In re Interest of J.S., S.C., and L.S.*, 224 Neb. 234, 397 N.W.2d 621 (1986).

The mother's final argument is that the statutory scheme under which her parental rights were terminated violates her constitutionally guaranteed right to equal protection. She contends that since the State has not shown a compelling, nor even a legitimate, reason for differentiating between a parent with a mental deficiency and one with a physical deficiency, the statutes must be struck down.

The equal protection clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In explaining the meaning of the clause, this court has stated, "Equal protection guarantees that similar persons will be dealt with similarly by the government." *State v. Michalski*, 221 Neb. 380, 384, 377 N.W.2d 510, 514 (1985). When examining a claim of deprivation of equal protection, then, the first inquiry is whether the statute discriminates among those who are similarly situated. See, e.g., *In re Interest of M.B., R.P., and J.P.*, 222 Neb. 757, 386 N.W.2d 877 (1986).

It seems to be the mother's claim that because § 43-292(5) provides for termination of parental rights when the parents are unable to discharge parental responsibilities because of mental illness, and there is no corresponding specific provision whereby those rights may be terminated because of physical illness, there is disparate treatment. However, under the statutory scheme, there is no prohibition to terminating those rights because of physical illness. As a matter of fact, § 43-292(6) provides that parental rights may be terminated following a determination that the juvenile is as described in Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984) (a juvenile "who is homeless or destitute, or without proper support through no fault of his or her parent . . ."), and reasonable efforts have failed to correct the conditions leading to the determination. It may also be argued that § 43-292(2) applies to physically ill parents; i.e., a termination may be had where the parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care

and protection.

There is no merit to the mother's claim of deprivation of equal protection.

The adjudication of the trial court is affirmed.

AFFIRMED.