IN RE INTEREST OF ANTHONY V., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. KIRSTEN W., APPELLANT.

680 N.W.2d 221

Filed June 1, 2004.   No. A-03-890.

Thomas C. Riley, Douglas County Public Defender, and Jeanine E. Creighton for appellant.

Stuart J. Dornan, Douglas County Attorney, and James M. Masteller for appellee.

Sievers and Cassel, Judges.

Cassel, Judge.

## INTRODUCTION

Kirsten W. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights to Anthony V. Kirsten asserts that the juvenile court erred in finding by clear and convincing evidence that Anthony comes within the meaning of Neb. Rev. Stat. § 43-292(2) and (10) (Reissue 1998) and in finding that termination of her parental rights serves Anthony's best interests. She also assigns that reasonable efforts to reunify her with Anthony were not undertaken. We affirm the decision of the juvenile court.

## BACKGROUND

On January 24, 2003, the State filed a petition seeking to adjudicate Anthony under Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002) and claiming that Kirsten, Anthony's mother, placed him in a situation dangerous to his life, limb, health, or morals.

The petition specifically alleged that on or about November 1, 2002, Kirsten's other child, Brian V., died due to shaken baby syndrome, and that Kirsten admitted to shaking Brian shortly before his death. Although the petition also made allegations against Anthony's father, Jose V., this appeal concerns only the allegations against Kirsten.

At the same time the petition was filed, the State also moved for placement of temporary custody of Anthony with the Nebraska Department of Health and Human Services (DHHS), claiming existence of an immediate and urgent need for Anthony's protection. That same day, the trial court found exigent circumstances supporting an order for immediate custody and placed Anthony in the custody of DHHS, where custody remained throughout these proceedings.

The court held a detention hearing on February 3, 2003. The trial court continued Anthony's temporary custody with DHHS and denied Kirsten visitation until otherwise ordered.

On April 30, 2003, the State filed an amended petition, seeking termination of Kirsten's parental rights. The State repeated its initial allegations and further alleged that reasonable efforts to preserve and reunify the family were not required under Neb. Rev. Stat. § 43-283.01 (Reissue 1998) because Kirsten had committed first or second degree murder or voluntary manslaughter of Brian, that Anthony came within the meaning of § 43-292(2) because of neglect of the child or a sibling and within the meaning of § 43-292(10) because Kirsten had committed murder or voluntary manslaughter of Brian, and that termination of Kirsten's parental rights would be in Anthony's best interests. The petition also stated that Kirsten was incarcerated at the Douglas County Correctional Center.

At the adjudication hearing, James Hospodka, an employee of Cox Communications, testified that at approximately 8:40 or 8:50 a.m. on November 1, 2002, he went to Kirsten's residence to install digital cable television service. Kirsten answered the door and told Hospodka that she could not speak well and her face was swollen because she had had dental surgery the preceding day. Hospodka observed that Kirsten's face did appear to be swollen and that Kirsten slurred her words. Hospodka testified that when Kirsten answered the door, she held in her left

arm an infant who appeared to be less than 1 year old. Another child, about 2 years old, stood next to Kirsten.

Hospodka testified that he told Kirsten he would go outside for a minute to turn on the cable television service and then return and that Kirsten appeared to understand. Hospodka asked Kirsten where she wanted the cable service installed. Kirsten pointed to the entertainment center. Hospodka then left to turn on the cable service. When he returned, the infant was lying in front of the couch on top of one or more blankets and a sleeping bag and Kirsten was resting on the couch. Hospodka thought the infant was awake. The infant appeared to be about to cry but could not; instead, the infant perhaps let out a squeak. Kirsten remained on the couch and did not pick up the infant. The older child played with toys close to the couch, became rowdy, and hammered something with a toy for a couple of minutes. Kirsten told the child to calm down. According to Hospodka, Kirsten redirected the child without exhibiting any frustration. Hospodka testified that Kirsten moved once from the couch, without any apparent difficulty, to get a larger television from the bedroom and that he took a smaller television into the bedroom from the living room. Hospodka reported that Kirsten moved only that one time during his visit, and he admitted that Kirsten appeared "pretty spaced out."

Hospodka testified that after he finished the installation, he asked Kirsten if she had any questions. Kirsten replied that she did not. Kirsten signed a work order for Cox Communications, and Hospodka departed. Hospodka testified that he spent approximately 45 minutes at the residence.

Hospodka testified that he did not see anyone other than Kirsten and the two children inside the apartment. He claimed that the children were present throughout his entire installation of the cable television service and that he observed no bruises or marks on either child.

Robert Wiley, an Omaha police officer, testified that on the afternoon of November 1, 2002, he responded to a call to go to Creighton University Medical Center to investigate Brian's death. When Wiley arrived at the hospital, the doctors and nurses were performing cardiopulmonary resuscitation on Brian. Wiley spoke to Kirsten shortly after he arrived. Kirsten

appeared to be upset and was crying and difficult to understand, but she appeared to understand his questions. Wiley testified Kirsten told him that she had laid Brian down for a nap at 11 a.m. and that she had lain down for a nap at 11:15 a.m. At 1:15 p.m., Kirsten awoke from her nap and fed Anthony. At 1:30 p.m., she checked on Brian. Kirsten said she found Brian lying face down on his bed, not moving and unresponsive. Kirsten told Wiley that she immediately took Brian to the hospital. Wiley testified that when he interviewed Kirsten, Kirsten was wearing pajamas, and that it did not appear that she had taken time to dress before coming to the hospital. Kirsten informed Wiley that Brian had been having problems with phlegm. During the interview, Kirsten asked Wiley more than once about Brian's condition.

Dr. Charles Denton, an emergency room physician board certified in emergency and internal medicine, testified that he had worked as an emergency room physician for 25 years. He testified that on November 1, 2002, at approximately 1:30 p.m., Brian arrived in the emergency room of Creighton University Medical Center and appeared lifeless. Denton stated that Brian's extremities had a purplish or bluish color secondary to lack of oxygen. Brian was not breathing or moving and had casts on both legs. He bore no outward signs of trauma. The emergency team initiated cardiopulmonary resuscitation on Brian. Because Brian lacked any heartbeat, the emergency team administered intubation and medicines. The team ceased efforts to revive Brian at 2:07 p.m., and Denton pronounced Brian dead.

Denton testified that at some point, he looked in Brian's ears, checking for blood behind the eardrums which would indicate trauma. Denton looked in at least one of Brian's eyes and saw some hemorrhages in the retina. Denton also felt Brian's head to detect swelling of the spine. Denton testified that other than the hemorrhages in the retina, he did not observe anything abnormal. He attributed significance to the hemorrhages in the eye because that could indicate the baby had been shaken or suffered some kind of trauma. Denton suspected Brian had died of shaken baby syndrome. Denton admitted that he had not received training specifically regarding shaken baby syndrome, though it may have been discussed at an annual meeting.

Denton testified that in the emergency room, Brian's rectal temperature was 93 degrees, compared to a normal temperature between 95 and 100.3 degrees for a healthy infant. Denton opined that because Brian's temperature was low, whatever happened had occurred more than 5 or 10 minutes before he was found. He concluded that Brian's temperature showed that Brian had been dead for more than 10 or 15 minutes before he arrived at the emergency room. Denton admitted that he could not state the rate at which body temperature decreases following death.

Denton testified that he had questioned Kirsten about the circumstances which led her to bring Brian to the hospital. Kirsten told him that Brian was placed prone for about 2 hours for a nap and that when she checked on him, he was not breathing. Denton testified that while cardiopulmonary resuscitation was being administered to Brian, the emergency team asked Kirsten questions about Brian's medical history. Kirsten reported that Brian had been born prematurely and that casts were placed on his feet to correct clubfoot. Kirsten also reported that Brian had been diagnosed with hypocalcemia (abnormally low concentration of calcium in the blood) of prematurity.

Dr. Jerry Wilson Jones, a licensed physician since 1958 specializing in pathology, testified that he was board certified in anatomic and clinical pathology, with a subspecialty board certification in forensic pathology, which focuses on both natural and violent deaths. Jones testified that he had performed over 7,000 autopsies and approximately 12 autopsies on victims of shaken baby syndrome.

Jones performed an autopsy on Brian at approximately 8 a.m. on November 2, 2002. He observed no external injuries other than the casts on both feet for treatment of clubfoot. Jones detected no fractures from x rays of Brian's body. Jones examined Brian's brain and detected an acute subdural hemorrhage over the surface of the left side and diffuse swelling of the brain. Jones testified that "acute" means the subdural hemorrhage happened "now" rather than days or weeks ago. He also noted old focal brain contusions on both sides of the surface of the brain, but he could not determine the cause of the old injuries. Further examination by Jones of Brian's brain resulted in no additional findings.

Jones testified that he also detected retinal hemorrhages in both of Brian's eyes. Jones noted that retinal hemorrhaging results from injury to the brain, when increased pressure in the brain is transmitted to the back of the eyes.

Jones opined that taken in the context of the entire case, the subdural hemorrhage and the diffuse brain swelling were "a result of diffuse injury to the brain or produced by the same action which is vigorous shaking of the infant." He stated that in his opinion, the vigorous shaking which produced the subdural hemorrhage also produced the diffuse swelling and injury in the brain and the increased pressure was then transmitted to the back of the eyes, producing the retinal hemorrhages. Jones concluded that shaken baby syndrome caused Brian's death.

Jones testified that the "vigorous shaking" required for shaken baby syndrome is a "very forceful act" and that "innocent, playful actions with an infant do not result in subdural hemorrhage . . . brain injury with brain swelling, and . . . retinal hemorrhages." He testified that an infant could not inflict these symptoms on himself or herself and that he did not believe a 2-year-old child could exercise sufficient force to produce such symptoms. Jones testified that if an infant is shaken with sufficient force to induce death, the force immediately renders the infant unconscious and unresponsive, with no subsequent period of lucidity. The infant may exhibit irregular breathing, stop breathing, or have convulsions. Death occurs very shortly after the shaking or almost simultaneously upon cessation of the shaking.

The court received into evidence Brian's death certificate listing the cause of death as a homicide and describing how the injury occurred as "child shaken by another individual."

Lance Worley, an Omaha police officer, testified that he had been trained in the identification and investigation of child abuse and that as part of his duties, he investigates child abuse and neglect situations and deaths involving children. Worley testified that on November 1, 2002, he was called to Creighton University Medical Center, where he spoke to emergency room staff and interviewed Kirsten privately in a conference room for approximately 20 minutes.

Worley conducted a second interview alone with Kirsten at the police station on November 5, 2002. Kirsten told Worley that

she and Brian had gone to bed at approximately 11 p.m. on October 31 and that there were no problems with Brian at that time. Worley testified that he had gotten the impression from Kirsten that both Kirsten and Jose were caring for Brian that evening. Kirsten told Worley that at approximately 3 a.m., she checked on Brian and Jose fed him, and that Brian experienced no problems at that time. Kirsten told Worley that at 8 a.m., Jose left for work, leaving Kirsten with the two boys. Kirsten informed Worley that she had contact with Brian between 7 and 8 a.m. and that he experienced no problems. At 9 a.m., the cable television system installer arrived and stayed for about 45 minutes. Kirsten told Worley that after the cable system installer left, Anthony was asleep and she was attempting to get Brian to go to sleep, but Brian was fussing and crying. She informed Worley that eventually, she laid Brian down for a nap sometime before 11 a.m. Kirsten told Worley that she napped until about noon or 12:30 p.m., then made lunch, went to check on Brian, and discovered that Brian was unresponsive. She told Worley that she approached Brian, put her hand on his buttocks, and shook him, but that he did not respond. She also put her hand on his back and shook him, but got no response. She then turned Brian over and found him totally unresponsive. Kirsten told Worley that she picked Brian up and ran to her sister-in-law's apartment downstairs and then took Brian to the hospital.

Worley testified that he had a third interview alone with Kirsten on January 22, 2003, at the police station. Worley testified that on the way to the interview room, Kirsten told him that she "wanted to get this over with and [that] she was going to cooperate." Once in the interview room, Worley read Kirsten her *Miranda* rights. Worley testified that he spoke to Kirsten about the funeral services for Brian and what had transpired since the last time they had talked. Worley had received the results of Brian's autopsy and advised Kirsten of the cause of death. Worley testified that Kirsten was very emotional and said she had already seen the death certificate with shaken baby syndrome listed as the cause of death. Worley testified that he asked Kirsten whether she shook Brian on November 1, 2002, and that she initially denied doing so. Worley testified he explained to Kirsten that the medical evidence· was clear, that a complete

investigation had been conducted, and that it was time for Kirsten to tell the truth. Worley testified that he also explained to Kirsten that he had "investigated such matters before and that people sometimes reach their breaking point, they have their frustrations and that [he] knew she had shaken [Brian]." Worley testified that Kirsten initially nodded her head up and down in response to this statement. He testified that he also told Kirsten that he knew she had never intended to hurt Brian. Worley testified that he then asked Kirsten how long she had shaken the baby and that Kirsten replied, "Three to four minutes." Worley testified Kirsten said that Brian's head was going back and forth from front to back and that about 15 minutes after the cable system installer left, she shook Brian because he would not be quiet and go to sleep. Kirsten told Worley that after she shook Brian, he whimpered and became quiet, and that she then put him to her chest, walked him to the bedroom, and laid him down. After laying Brian down, Kirsten fell asleep. Worley testified Kirsten told him that when she put Brian down for his nap, Brian's eyes were fine and he was still whining.

Worley testified that he attended the autopsy and that based on his investigation and his conversations with the coroner, he determined Brian's cause of death to be shaken baby syndrome. Worley admitted that before the interview with Kirsten, he knew the admissions Kirsten would have to make to conform to the theory of shaken baby syndrome as the cause of death. Worley testified that based on his conversations with Kirsten and the other officers' reports, no one but Kirsten and the children was in the house after 10 a.m. on November 1, 2002. Worley testified that he did not believe Kirsten woke up that morning intending to harm Brian, but Worley believed the stresses and frustrations in her life, as well as her recent dental surgery, were factors that led her to the "breaking point."

Worley testified that Kirsten did not agree with everything he said on January 22, 2003. He testified that three or four times during the January 22 interview, he either stated that Kirsten had shaken Brian or asked whether she had, and that she denied it each time. Worley testified that initially, these were the only statements with which Kirsten disagreed. He testified that he did "a good portion of the talking" and that Kirsten just agreed.

When Worley asked Kirsten to demonstrate how she had shaken Brian, she raised her arms, but then she dropped them and began to cry. Worley testified that he then demonstrated a shaking motion with his arms and that Kirsten agreed the motion accurately portrayed how she had shaken Brian.

Shayne Schiermeister, a state Child Protective Services worker, testified that he does initial assessments on families whose children have been removed or where there is an investigation to determine risk to children. He testified that his agency received a referral reporting a child had died in Kirsten's home and that he was assigned to conduct the investigation. Schiermeister testified that he interviewed Kirsten, Jose, Worley, and Brian's grandmother.

Schiermeister interviewed Kirsten on January 27, 2003, at the Douglas County Correctional Center. He stated that Kirsten seemed upset about Anthony being placed in foster care. Schiermeister testified that he reviewed police reports regarding Brian's death, which reports contained interviews with Kirsten. Schiermeister testified that he had gleaned from the police reports and his interview with Worley that Kirsten had admitted to shaking Brian. Schiermeister testified that when he asked Kirsten about Brian's death, she stated that she was "tricked" into admitting to the officers that she had shaken Brian. Kirsten told Schiermeister that she would never harm one of her children, and she denied shaking Brian. Schiermeister testified that during his discussion with Kirsten regarding Brian's death, she seemed relatively calm and did not show much emotion. Schiermeister contrasted this with the upset and tearful demeanor Kirsten exhibited while discussing Anthony. Schiermeister testified that he also asked Kirsten about previous domestic violence issues as well as chemical and alcohol use.

Schiermeister testified that he independently investigated some but not all of the events on the day Brian died. Based on Schiermeister's entire investigation, he concluded that Anthony should remain in foster care and that the case should be transferred to an ongoing worker for family assessment and case planning. He stated that he had several concerns, including Brian's death under Kirsten's care and previous domestic violence issues.

Schiermeister testified that a realistic permanency plan for Anthony could include termination of Kirsten's parental rights.

Jackie Rowe, a DHHS caseworker, testified that her duties included completing family assessments to evaluate safety and to develop case plans for safe reunification. She was assigned to Anthony's case on January 31, 2003. Rowe conducted a family assessment by meeting with Kirsten and Jose on two separate occasions, speaking to a family member, attending a supervised visit between Jose and Anthony, and meeting with Anthony several times.

Rowe testified that she first met with Kirsten on February 12, 2003. Rowe explained her job and the court process to Kirsten, and Rowe asked Kirsten about her family history and her parenting of Anthony. On that occasion, Rowe did not question Kirsten about Brian's death.

Rowe testified that she interviewed Kirsten a second time on May 14, 2003, at the Douglas County Correctional Center. Rowe explained to Kirsten that a motion to terminate her parental rights had been filed, and Rowe talked about Anthony's placement and progress. Rowe did not ask Kirsten about Brian's death, but Kirsten told Rowe that she did not do anything to harm Brian. Kirsten mentioned that she had witnessed behavior by Jose which concerned her and that she was beginning to wonder if Jose had had a role in Brian's death. Kirsten told Rowe that the evening before Brian's death, Kirsten underwent oral surgery and had followed up by taking prescription medications. Kirsten said she had asked Jose to watch Brian that evening because she did not know whether she would awaken if Brian cried. Rowe testified that Kirsten told her that at the time of Brian's death, Jose was employed full time during the day and Kirsten stayed home with the children. Kirsten reported a fairly significant history of domestic violence between herself and Jose.

Rowe testified that based on all the evidence she had read, including police reports containing statements by Kirsten, Rowe believed Kirsten had killed Brian. Rowe testified that there was no indication in the file that Brian had died of sudden infant death syndrome. Rowe admitted that she was not aware of any criminal conviction surrounding Brian's death.

Rowe testified that Kirsten had given Rowe cards, gifts, and letters for Anthony but that Rowe had put them in the file and had not given them to Anthony.

Rowe testified that through the family assessment, she identified potential risks to Anthony as the risk involving domestic violence and the risk related to Brian's death in the home, and she testified that these risks existed when the State filed its petition for termination of parental rights and continued to exist. Rowe testified that in her opinion, termination of Kirsten's parental rights was in Anthony's best interests because Brian's death posed a serious risk to Anthony's future safety, due to his age and vulnerability. Rowe also stated that violence between two adults puts a child at risk because the child could become involved in an incident of violence and be harmed and because witnessing such incidents causes an emotional impact on the child. Rowe testified that services are available to correct domestic violence.

With respect to Kirsten, the trial court found that Anthony came within the meaning of § 43-247(3)(a) by a preponderance of the evidence, that Anthony came within the meaning of § 43-292(2) and (10) by clear and convincing evidence, and that termination of Kirsten's parental rights was in Anthony's best interests. The trial court accordingly terminated Kirsten's parental rights to Anthony.

## ASSIGNMENTS OF ERROR

On appeal, Kirsten alleges (1) that DHHS failed to make reasonable efforts to reunify her with Anthony, violating her rights under the Due Process and Equal Protection Clauses of the 5th and 14th Amendments to the U.S. Constitution, and (2) that the State failed to prove by clear and convincing evidence (a) that Kirsten had neglected Anthony and refused to give him necessary protection under § 43-292(2), (b) that Kirsten was guilty of committing murder or manslaughter of Anthony's sibling as required under § 43-292(10), and (c) that termination of Kirsten's parental rights was in Anthony's best interests.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of

the juvenile court's findings; however, when the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Kiana T.,* 262 Neb. 60, 628 N.W.2d 242 (2001).

## ANALYSIS

*Statutory Factors.*

▮ Kirsten contends that the court erred in finding that the State met its burden of proof concerning the statutory grounds for termination of parental rights under § 43-292(2) and (10). Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *In re Interest of Natasha H. & Sierra H.,* 258 Neb. 131, 602 N.W.2d 439 (1999). See Neb. Rev. Stat. § 43-279.01(3) (Reissue 1998). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Constance G.,* 254 Neb. 96, 575 N.W.2d 133 (1998).

We digress to comment on the standard of review we apply in our analysis of § 43-292(10), which requires us to determine if Kirsten has committed murder or manslaughter of Anthony's sibling. In *Santosky v. Kramer,* 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982), the U.S. Supreme Court held that the clear and convincing evidence standard was sufficient to satisfy the requirements of due process in termination of parental rights cases and stated, "We further hold that determination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts." The Legislature and the courts of Nebraska have consistently applied the clear and convincing standard to termination of parental rights cases. See, e.g., § 43-279.01(3); *In re Interest of Kantril P. & Chenelle P.,* 257 Neb. 450, 598 N.W.2d 729 (1999); *In re Interest of Shepherd,* 211 Neb. 313, 318 N.W.2d 288 (1982).

In *In re Interest of Storee J.,* No. A-01-638, 2002 WL 975977 (Neb. App. May 14, 2002) (not designated for permanent publication), this court found clear and convincing evidence that the

parent had subjected the child to sexual abuse as provided in § 43-292(9), which subsection was added as a ground for termination of parental rights along with subsection (10). In that case, the parent argued that subsection (9) requires a " 'certified conviction.' " 2002 WL 975977 at 3. We responded, "There is no requirement that allegations against a parent which also could serve as the basis for criminal charges must be proven only with evidence of 'a certified conviction.' Rather, there must only be clear and convincing evidence that such conduct occurred." *Id.* at 4. See, also, *In re Adoption of A.F.M.*, 15 P.3d 258 (Alaska 2001) (statute authorizing court to terminate parental rights of biological parent in adoption proceeding if it finds that child's conception resulted from act of sexual assault and that termination is in child's best interests is noncriminal measure; thus, right to jury trial and requirement of proof beyond reasonable doubt are not implicated); *In re Clarence T.B.*, 215 Ill. App. 3d 85, 574 N.E.2d 878, 158 Ill. Dec. 765 (1991) (fact that parents were acquitted of criminal charges did not preclude finding of sexual abuse in proceeding to terminate parental rights; in criminal prosecution, trier of fact determined that State of Illinois failed to prove beyond reasonable doubt that parents committed charged offenses, whereas in termination proceeding, State of Illinois only needed to prove that parents committed such offenses by lesser standard of clear and convincing evidence).

In *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992), the Nebraska Supreme Court acknowledged that differing standards of proof apply to criminal and juvenile cases and determined that a parent's conduct may be grounds for a juvenile court to acquire jurisdiction under the clear and convincing standard, notwithstanding that the parent was acquitted of a criminal charge for conduct detrimental to the child under the beyond a reasonable doubt standard. See, also, *State v. Yelli*, 247 Neb. 785, 530 N.W.2d 250 (1995) (because civil judgments have lower burden of proof than criminal trials, doctrines of res judicata and collateral estoppel are not applicable as bases for admission of prior civil judgments in subsequent criminal trial; but judgment in civil paternity adjudication is res judicata as between same parties in subsequent civil action such as support modification proceeding because burdens of proof for two actions are same).

■ In light of the standard of review for evaluating termination of parental rights cases, set forth in § 43-279.01 and the above-cited cases, and considering that this case does not involve a criminal prosecution, we apply the clear and convincing evidence standard to determine whether Anthony comes within the meaning of § 43-292(10).

■ Under § 43-292(10), the juvenile court may terminate parental rights between the parent and child when it is in the best interests of the child and "[t]he parent has (a) committed murder of another child of the parent [or] (b) committed voluntary manslaughter of another child of the parent . . . ." We find no appellate cases interpreting or applying § 43-292(10). However, in the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *In re Interest of J.K.*, 265 Neb. 253, 656 N.W.2d 253 (2003). The plain language of § 43-292(10) does not require a criminal conviction or proof beyond a reasonable doubt that a parent has committed voluntary manslaughter or murder of his or her child, but merely clear and convincing evidence that the parent "committed" murder or voluntary manslaughter of his or her child. Under the criminal statutes of this state, a person commits manslaughter when he or she "kills another without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act." Neb. Rev. Stat. § 28-305(1) (Reissue 1995). "A person commits murder in the second degree if he [or she] causes the death of a person intentionally, but without premeditation." Neb. Rev. Stat. § 28-304(1) (Reissue 1995).

Hospodka testified that he saw Brian alive and conscious on November 1, 2002. From the time Hospodka left, approximately 9:30 a.m., until the time Kirsten discovered that Brian was unconscious and unresponsive, approximately 12:30 p.m., Kirsten remained alone with her children in the apartment. At approximately 1:30 p.m., she arrived at the hospital with Brian, who was still unconscious and unresponsive. The doctor pronounced Brian dead at 2:07 p.m.

Denton testified that based on the retinal hemorrhaging he discovered, he suspected Brian had died of shaken baby syndrome.

Jones performed an autopsy of Brian. Jones observed subdural hemorrhaging in Brian's brain, diffuse swelling of Brian's brain, and retinal hemorrhaging in Brian's eyes, and Jones concluded that shaken baby syndrome caused Brian's death. Jones testified that the hemorrhaging he observed in Brian resulted from vigorous shaking and could not have been caused by innocent play, by Anthony, or by Brian himself. Jones also stated that immediately after the cessation of shaking, an infant will become unconscious and unresponsive and may have difficulty breathing, stop breathing, or have convulsions. The only opportunity for these injuries existed while Brian was under Kirsten's sole care.

Kirsten admitted to Worley that she had shaken Brian for 3 or 4 minutes on the day he died because he was crying and would not sleep. She also admitted that Brian's head was moving in a front to back motion as she shook him and that Brian whimpered and then became quiet. While there is evidence, consisting of Kirsten's own assertions, that she did nothing to harm Brian, the trial court apparently rejected that evidence. We give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. See *In re Interest of Kiana T.*, 262 Neb. 60, 628 N.W.2d 242 (2001).

Upon our de novo review of the record, we find clear and convincing evidence that Kirsten caused the death of Brian, Anthony's sibling, and thereby committed either murder or voluntary manslaughter. We conclude that Anthony comes within the meaning of § 43-292(10).

Because the State need show by clear and convincing evidence only one of the grounds for termination of parental rights in § 43-292 to be present, we need not address whether Anthony comes within the meaning of § 43-292(2). See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court need not address issue not necessary to decision).

*Best Interests.*

Kirsten argues that the trial court erred in finding that terminating her parental rights served Anthony's best interests. The termination of parental rights should be used only as a last resort. *In re Interest of M.M., C.M., and D.M.*, 234 Neb 839, 452

N.W.2d 753 (1990). To terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001).

The State removed Anthony from Kirsten's home upon evidence that Kirsten had caused the death of Anthony's younger sibling, Brian. At trial, the State presented clear and convincing evidence showing that Kirsten shook Brian, resulting in his death. The State also presented testimony referring to drug use by Jose and domestic violence between Kirsten and Jose. Rowe testified that domestic violence posed a danger to Anthony, both physically and emotionally, and that in light of Anthony's age and vulnerability, the manner in which Brian died signaled a significant risk to Anthony.

Although Anthony has not yet experienced actual injury or physical harm, "a court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child." See *In re Interest of S.L.P.*, 230 Neb. 635, 639, 432 N.W.2d 826, 830 (1988). Further, a child cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000). Upon de novo review, we conclude that Anthony's best interests require termination of Kirsten's parental rights.

*Efforts to Reunify.*

Kirsten argues that DHHS failed to make reasonable efforts to reunify her with Anthony as required by § 43-283.01, violating her state and federal constitutional rights to due process. Section 43-283.01 requires reasonable efforts to reunify the family, but subsection (4) excuses the requirement if "a court of competent jurisdiction has determined that . . . (b) [t]he parent of the juvenile has (i) committed first or second degree murder to another child of the parent [or] (ii) committed voluntary manslaughter to another child of the parent . . . ." The juvenile court is the "court of competent jurisdiction" to make such a determination under § 43-283.01(4)(b). See *In re Interest of Janet J.*, 12 Neb. App. 42, 666 N.W.2d 741 (2003), *disapproved*

*on other grounds, In re Interest of Jac'Quez N.,* 266 Neb. 782, 669 N.W.2d 429 (2003).

On appeal, Kirsten argues that only a preexisting judicial determination of criminal or civil guilt can support the condition under § 43-283.01(4)(b). Certainly, a final conviction in the district court, which tries such felony crimes as murder and manslaughter, would fulfill the condition of § 43-283.01(4)(b). But, the statute does not limit satisfaction of the condition to that situation. A probate court possesses competent jurisdiction to determine, without any prior criminal conviction, existence of a homicide to preclude inheritance by the killer from the victim. See *In re Estate of Krumwiede,* 264 Neb. 378, 647 N.W.2d 625 (2002). Similarly, the juvenile court possesses competent jurisdiction to determine existence of a homicide by a parent to protect the victim's sibling. See *In re Interest of Janet J., supra.*

Upon de novo review, we have concluded that clear and convincing evidence shows that Kirsten caused the death of Anthony's sibling, as described under § 43-292(10). The language of that statute is substantially similar to § 43-283.01(4)(b). Upon the same evidence and for the same reasons, we find that clear and convincing evidence of the killing under § 43-283.01(4)(b) excuses DHHS from the requirement to make reasonable efforts to reunify Kirsten with Anthony.

█ Kirsten argues that her due process rights under the 5th and 14th Amendments to the U.S. Constitution and the equivalent provision of the Nebraska Constitution were violated by DHHS' lack of efforts to reunify her with Anthony. However, Kirsten did not raise the constitutional issue before the trial court, and "an appellate court will not consider a constitutional question on appeal that was not raised and properly presented for disposition by the trial court." See *In re Interest of Phyllisa B.,* 265 Neb. 53, 58, 654 N.W.2d 738, 742 (2002). Accordingly, we decline to do so.

## CONCLUSION

Upon our de novo review, we find that clear and convincing evidence supports the existence of the condition specified in § 43-292(10), that termination of Kirsten's parental rights was in Anthony's best interests, and that reasonable efforts to reunify

were excused by § 43-283.01(4)(b). We therefore affirm the juvenile court's order terminating Kirsten's parental rights to Anthony.

AFFIRMED.

CARLSON, Judge, participating on briefs.