IN RE INTEREST OF CHLOE L. AND ETHAN L.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,
V. DEANNA J., APPELLANT, AND DANIEL L.,
APPELLEE AND CROSS-APPELLANT.
712 N.W.2d 289

Filed April 11, 2006.   No. A-05-1072.

Jeffrey A. Wagner, of Schirber & Wagner, L.L.P., for appellant

Stuart J. Dornan, Douglas County Attorney, and Kristin L. Huber for appellee State of Nebraska.

Regina T. Makaitis for appellee Daniel L.

SIEVERS, CARLSON, and MOORE, Judges.

CARLSON, Judge.

## INTRODUCTION

Deanna J. appeals and Daniel L. cross-appeals from an order of the separate juvenile court of Douglas County terminating Deanna's and Daniel's parental rights to their two minor children. On appeal, Deanna and Daniel contend that the trial court erred in finding clear and convincing evidence to terminate their parental rights under Neb. Rev. Stat. § 43-292(2), (3), (8), (9), and (10)(d) (Reissue 2004) and in finding that termination of their rights is in their children's best interests. For the reasons set forth below, we affirm.

## BACKGROUND

Deanna and Daniel are the parents of Chloe, born August 16, 2003, and Ethan, born August 9, 2004. On September 24, 2004, the State filed a petition in juvenile court alleging that Chloe and Ethan came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2004) by reason of the faults or habits of Deanna. On that same date, the juvenile court placed both children in foster care.

On December 1, 2004, the State filed a second amended petition alleging that pursuant to § 43-247(3)(a), Deanna and Daniel placed both children in a situation which was "dangerous to their life or limb, or injurious to the[ir] health or morals" in that on September 22, Ethan had been treated for a broken arm. The petition alleged that while treating Ethan, medical personnel discovered that Ethan had sustained multiple fractures throughout his body, which fractures were in various stages of healing. The petition stated that Ethan was in Deanna and Daniel's care at the time the injuries occurred and that neither parent had given a plausible explanation for Ethan's injuries.

The petition also alleged that Deanna's and Daniel's parental rights should be terminated. In that regard, the petition alleged Ethan came within the meaning of § 43-292(8) and (9) in that Deanna and Daniel had inflicted, by other than accidental means, serious bodily injury, and in that Deanna and Daniel had subjected Ethan to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. The petition also stated that Chloe and Ethan came within the meaning of § 43-292(2), (3), and (10)(d) in that: Deanna and Daniel had substantially and continuously neglected or refused to give their children necessary parental care and protection; Deanna and Daniel, being financially able, had willfully neglected to provide their children with the necessary subsistence, education, or other care necessary for their health, morals, or welfare; and Deanna and Daniel had committed a felony assault that resulted in serious bodily injury to Ethan. The petition also alleged that termination of Deanna's and Daniel's parental rights was in the best interests of both Chloe and Ethan.

On February 8 through 11, April 6, 8, and 21, and May 5, 2005, hearings were held on the State's second amended petition.

The record from those hearings shows that at all relevant times alleged in the petition, Deanna and Daniel resided with Daniel's father and younger brother in a three-bedroom apartment in Omaha. Daniel worked the night shift from 11 p.m. to 7 a.m., while Deanna stayed at home with the children.

The record shows that prior to Ethan's birth, Deanna and Daniel had agreed to place Ethan for adoption. After the adoptive parents decided not to adopt Ethan, Deanna and Daniel arranged for Ethan to stay at the home of various friends until Ethan was 2 to 4 weeks of age, when Ethan came to reside with Deanna and Daniel.

On September 22, 2004, Deanna noticed that Ethan was favoring one of his arms in that Ethan was not moving the arm much and had it pulled up near his body. Deanna did not notice any bruising or swelling on Ethan's arm. In the late afternoon, Deanna took Ethan to Children's Hospital in Omaha so that his arm could be checked out.

After examining Ethan's arm, doctors found that the arm was fractured and that Ethan had a total of 29 fractures throughout his body in various stages of healing. Tests showed that there was no organic cause for Ethan's injuries and that Ethan's bone density was normal. When asked by police officers what might have happened to Ethan, Deanna stated that at 5 p.m. on September 21, 2004, she had left Ethan in a "bouncy seat" while she went into the kitchen to fix Ethan's bottle. Deanna stated that when she returned, Ethan was lying face down on the floor with Chloe nearby. Deanna stated that she believed Chloe pulled Ethan out of his bouncy seat. Daniel told police officers that he did not witness this incident but that Deanna had told him about it after it happened. Daniel stated, though, that the incident occurred earlier on September 21, since Deanna told him about it when he got up at noon on that day to use the restroom. After discovering Ethan's fractures, doctors also examined Chloe and no injuries were found. Criminal charges were never brought against Deanna or Daniel.

At trial, the State called several witnesses to testify, including Dr. Sandra Allbery, a radiologist at Children's Hospital. Allbery testified that an infant's bones are generally strong and not easily broken in a normal child. Allbery compared an infant's bones

to green tree limbs, stating that although they bend, they rarely break. Allbery testified that upon examining the results of tests done on Ethan on September 22, 2004, she noted that Ethan had four acute fractures, consisting of two "corner fractures," a right collarbone fracture, and a fracture to Ethan's left humerus, or upper arm.

Allbery described the humerus fracture as a complex or spiral fracture in that this fracture was bidirectional, which implies increased force. Allbery stated that the amount of force necessary to break a humerus bone would be equal to the force necessary to break a bundle of pencils. Allbery defined an acute fracture as a fracture less than 10 days old and stated that Ethan's left arm fracture was probably less than 5 days old.

Allbery testified that the balance of Ethan's fractures were nonacute, or more than 10 days old, and consisted of 18 rib fractures in addition to multiple fractures of Ethan's femur and tibia bones in both his left and right legs and a fracture to Ethan's left collarbone. Allbery stated that the tests showed that Ethan did not have any head injuries.

Allbery further testified that Ethan had normal bone density with no evidence of bone disease. Allbery testified that if Ethan had an underlying bone condition, she would have expected to see more acute fractures. Allbery also testified that some of Ethan's fractures could date back to his birth but that Ethan's fractures would be highly unusual for anything related to birth trauma. Allbery testified that instead, Ethan's injuries were caused by nonaccidental trauma, and that Ethan's fractures were classic locations for injuries resulting from child abuse, because Ethan's injuries were not the type of fracture caused by any sort of accident.

Allbery testified that whoever inflicted Ethan's injuries used a large degree of force and that Ethan's fractures would not occur easily or with normal handling of an infant. Allbery testified that the injuries to Ethan's limbs were caused by someone shaking them and that Ethan's rib fractures were caused by someone squeezing Ethan's ribs. Allbery testified that Ethan's injuries were of the same type as those children diagnosed with shaken baby syndrome except that Ethan did not sustain a head injury. Allbery testified that Chloe was not capable of causing Ethan's injuries.

Allbery noted that a second set of x rays taken on January 18, 2005, showed both that Ethan's fractures to his limbs had healed and that no new fractures were present. Allbery testified that a second set of x rays of Ethan's ribs were not done and that those x rays were unnecessary, given the evidence that the other fractures were healing.

Dr. John Tubbs, a family practitioner, also testified at trial. Tubbs testified that he provided prenatal care for Deanna and that at the time of trial, he was providing medical care for both children. Tubbs testified that after Chloe's birth, Deanna and Daniel routinely brought Chloe in for visits, and that he never had any concerns about the care Chloe received from her parents.

Tubbs testified that he delivered Ethan and that Ethan did not suffer any fractures during his birth. On September 13, 2004, Tubbs saw Ethan for a well-baby check and Deanna and Daniel had yet to decide if Ethan would reside with them permanently. Tubbs testified that at the time of that checkup, he had concerns relating to both the failed adoption and Ethan's final disposition. Tubbs testified that despite this fact, Deanna appeared to be doing well and had a positive attitude.

Tubbs also testified that he examined Ethan at the September 13, 2004, appointment and saw no signs of fractures, even though Tubbs acknowledged that Ethan probably already had some fractures, given what the x rays showed on September 22. Tubbs testified that he did not see any bruising on Ethan but that bruising is not always present with a broken bone. Tubbs testified that he did not recall Ethan's crying much during the examination and that he did not recall Ethan's crying out in pain when Tubbs checked Ethan's hips for dislocation. Tubbs opined that Ethan's injuries were caused by physical abuse.

Dr. Jeffrey DeMare, an attending physician in the pediatric intensive care unit and the medical director of the Children's Advocacy Team at Children's Hospital, also testified. DeMare stated that he examined Ethan at Children's Hospital on September 23, 2004. DeMare testified that during the examination, Ethan was easily excitable and any manipulation of Ethan's body would cause him to cry. DeMare stated that fractures cause pain and that the more mobile a child is, the more pain he or she will feel. DeMare also stated that he did not observe any bruises

on Ethan and that Ethan's parents would not necessarily have known of Ethan's fractures if someone else was inflicting them.

DeMare also stated that Ethan's fractures were caused by nonaccidental trauma or child abuse. DeMare stated that the person inflicting Ethan's injuries used substantial force and that therefore, Chloe did not injure Ethan by pulling him out of his bouncy seat. DeMare also testified that tests showed that Ethan's injuries were not caused by any type of bone disease. DeMare testified that an additional test, called a "collagen test," could have been done but that it was not necessary, given the other tests which doctors had performed on Ethan.

Dr. Horacio Plotkin, an assistant professor of pediatrics and orthopedic surgery at the University of Nebraska Medical Center and the director of the Metabolic Bone Diseases Clinic at Children's Hospital, also gave testimony. Plotkin testified extensively regarding whether Ethan has a bone disease disposing him to fractures. Plotkin concluded that Ethan had no signs of any bone disease and stated that the tests used in that determination were the "gold standard" of testing procedures. Additionally, Plotkin agreed that although a collagen test could have been performed on Ethan, a collagen test is not standard practice, given that it does not rule out bone diseases if the results are negative. Specifically, a collagen test could tell absolutely that Ethan has a bone disease if the test was positive, but if the test was negative, it would not mean that Ethan does not have a bone disease.

Jackie Fink testified that she was a protection and safety worker with the Nebraska Department of Health and Human Services (DHHS). Fink testified that on September 27, 2004, Chloe and Ethan were assigned to her caseload. Fink testified that she observed Deanna and Daniel interact with both children on three occasions in October 2004 and possibly on another occasion prior to Christmas that year.

Fink testified that she did not come to a conclusion as to who harmed Ethan, but Fink opined that Deanna's and Daniel's parental rights should be terminated and that termination is in the children's best interests, based on the "whole case" and more specifically on the "amount of and severity of injuries that happened to Ethan, the lack of knowing who inflicted the injuries . . . and the safety of the children in general."

Fink testified that she was unable to come up with a rehabilitation plan for Deanna and Daniel "[d]ue to the safety and risk to the children and not knowing for sure what happened or who inflicted the injuries to Ethan." Fink testified that she did not think it was safe for Chloe and Ethan to be returned home regardless of whether the parents or someone else harmed Ethan. Fink further testified that even if neither parent injured Ethan, there were no services that the State could offer Deanna and Daniel in order to reunite them with their children. On cross-examination, Fink testified that psychological evaluations of the parents, parenting classes, chemical dependency evaluations, and psychiatric evaluations could "[p]ossibly" have been helpful in reuniting Deanna and Daniel with Chloe and Ethan.

The State also called several police officers to testify. Sgt. Alan Reyes, a police officer with the city of Omaha, testified that he investigated Ethan's injuries. Reyes testified that Deanna told him that Ethan had been injured by Chloe's act of pulling Ethan from his bouncy seat. Reyes testified that Deanna gave him permission to search the family's apartment. Reyes testified that the apartment was clean and stockpiled with supplies. Reyes stated that the bouncy seat was on a carpeted floor in the living room and that according to his training, falling out of the bouncy seat onto the carpet could not have caused Ethan's injuries.

Det. Jerald Swanson, another police officer with the city of Omaha, also investigated Ethan's injuries. Swanson testified that he examined Ethan on September 22, 2004, and that he noticed eight "marks" on Ethan that appeared to be bruises—three on his back, one on his left elbow, one on his left hip, two on his left knee, and one behind his left ear.

Swanson testified that after observing the "marks," he spoke to a radiologist at Children's Hospital who told him Ethan's acute fractures had occurred within the last 3 days and Ethan's older fractures, especially those to his ribs, were approximately 2 weeks old. Swanson testified that during his interview with Deanna, she indicated that she and Daniel had intended to offer Ethan for adoption but that the adoptive family had backed out for undisclosed reasons. Deanna indicated to Swanson that Ethan had been living with Deanna and Daniel for 2 to 4 weeks prior to September 22, 2004, given that Ethan had stayed with

various friends and family after he was released from the hospital. Deanna also stated that Ethan was a good child but that he was somewhat colicky, which she attributed to having been given a certain formula.

Swanson testified Deanna indicated that she was Ethan's primary caregiver during the day but that Daniel provided care for the children if she slept in. Swanson also testified that Deanna gave him a timeline in regard to who may have had contact with Ethan from September 17 to 22, 2004. Swanson stated that on September 18, Deanna and her cousin had taken the children to a football game, but Deanna did not relay that anything had happened to Ethan while they were at the game. Deanna also indicated to Swanson that on September 20, she had left the children with Daniel's brother for 1½ hours while she ran errands, but she did not mention whether she observed any injuries to Ethan upon her return. Deanna did not indicate to Swanson that there were any other occasions from September 17 to 22 where someone other than herself or Daniel cared for the children.

The trial court held that Deanna's statements to Swanson were admissible against Deanna but could not be used in the case against Daniel. Two other police officers also testified, but given that these officers did not provide any new information, we do not detail their testimony here.

After the State presented its case, Deanna and Daniel separately moved to dismiss the State's second amended petition, for failure to meet its burden. The trial court overruled both motions. Both parents then rested without presenting any evidence.

In an order filed August 11, 2005, the trial court terminated Deanna's and Daniel's rights to Chloe and Ethan, finding that termination of their rights in regard to Ethan was justified by clear and convincing evidence under § 43-292(8) and (9), while clear and convincing evidence supported the termination of their rights to both children under § 43-292(2), (3), and (10)(d). The trial court also stated that termination of Deanna's and Daniel's rights was in the children's best interests. Deanna appeals, and Daniel cross-appeals.

## ASSIGNMENTS OF ERROR

Given that Deanna and Daniel present the same assignments of error, we set out the assignments of error as follows: Deanna

and Daniel contend that the trial court erred in finding that (1) clear and convincing evidence supports the termination of their parental rights under § 43-292(2), (3), (8), (9), and (10)(d) and (2) clear and convincing evidence shows that termination of their parental rights is in the children's best interests.

## STANDARD OF REVIEW

■ Cases arising under the Nebraska Juvenile Code, and specifically an appeal from an order terminating parental rights, shall be reviewed de novo on the record, and an appellate court must reach conclusions independent of the trial court's findings while disregarding impermissible or improper evidence. *In re Interest of Kindra S., ante* p. 202, 705 N.W.2d 792 (2005). See *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

■ The interpretation of statutes presents questions of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002).

## ANALYSIS

■ On appeal, both Deanna and Daniel contend that the trial court erred in finding that clear and convincing evidence supports the termination of their parental rights to both Chloe and Ethan. Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *In re Interest of Skye W. & McKenzie W., ante* p. 74, 704 N.W.2d 1 (2005). The grounds for terminating parental rights must be established by clear and convincing evidence, which is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *Id.*

Section 43-292(2) states that a parent's rights may be terminated if a parent has "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection."

■ In regard to that question, we note that this court has held that a finding of abuse or neglect may be supported where the

record shows (1) a parent's control over the child during the period when the abuse or neglect occurred and (2) multiple injuries or other serious impairment of health has occurred which ordinarily would not occur in the absence of abuse or neglect. *In re Interest of McCauley H.*, 3 Neb. App. 474, 529 N.W.2d 77 (1995). Although *In re Interest of McCauley H.* was an appeal from an adjudication, we extend its holding to the instant case.

The record shows that on September 22, 2004, Ethan was approximately 6 weeks old and had been in his parents' care for at least 2, if not 4, weeks. The record also establishes that Ethan had sustained both acute and nonacute fractures and that the acute fractures were 5 to 10 days old, while the nonacute fractures were over 10 days old. The record also contains evidence that from September 17 to 22, Ethan was in the sole care of Deanna and Daniel except for 1½ hours on September 20 when Daniel's brother watched the children while Deanna ran errands. No evidence was presented that Ethan sustained his injuries while in Daniel's brother's care. Rather, Deanna and Daniel presented evidence that Ethan was injured when Chloe pulled him out of his bouncy seat on September 21. The State presented numerous witnesses who disputed that event as the cause of Ethan's injuries.

Additionally, the evidence establishes that Ethan suffered multiple injuries which would not have occurred in the absence of abuse or neglect. Three doctors testified that the person who inflicted Ethan's injuries used a great deal of force to cause Ethan's 29 fractures and that such injuries were caused by the violent shaking of Ethan's limbs and the squeezing of his ribs from both the front and the back. All three doctors also testified that there was no way Ethan's injuries could have been accidental and that his injuries were caused by child abuse.

After a de novo review, we find that the State proved by clear and convincing evidence that Deanna's and Daniel's parental rights should be terminated to both Chloe and Ethan under § 43-292(2), given that Deanna and Daniel substantially and continuously or repeatedly neglected and refused to give Ethan necessary care and protection. Under § 43-292(2), the proof of the neglect and failure to protect Ethan provided grounds for

termination of both parents' rights to Ethan's sibling, Chloe. Because the State need show by clear and convincing evidence the presence of only one of the grounds for termination of parental rights in § 43-292, we need not address whether the children come within the meaning of § 43-292(3), (8), (9), or (10)(d). See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court need not address issue not necessary to decision).

Deanna and Daniel argue that the trial court erred in finding that the termination of their rights is in Chloe's and Ethan's best interests.

Fink, the family's caseworker with DHHS, testified that Deanna's and Daniel's parental rights should be terminated and that termination is in the children's best interests, based on the "whole case," and more specifically on the "amount of and severity of [Ethan's] injuries . . . and the safety of the children in general." Fink testified she did not think that it was safe for Chloe and Ethan to be returned home, given Ethan's injuries.

■ We note that although Chloe has not yet experienced actual injury or physical harm, a court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child. See *In re Interest of Anthony V.*, 12 Neb. App. 567, 680 N.W.2d 221 (2004). A child cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.*

Given the severity of Ethan's injuries, as noted above, and the fact that Deanna and Daniel failed to protect Ethan from those injuries, clear and convincing evidence shows that termination is in both Chloe's and Ethan's best interests.

## CONCLUSION

After reviewing the record de novo, we conclude that the trial court did not err in finding that clear and convincing evidence supports the termination of Deanna's and Daniel's parental rights to Chloe and Ethan under § 43-292(2) or in finding that clear and convincing evidence shows that termination of Deanna's and Daniel's parental rights is in the children's best interests. For those reasons, we affirm the court's order terminating Deanna's and Daniel's parental rights to both Chloe and Ethan.

AFFIRMED.