STATE OF NEBRASKA, APPELLEE, V. JUAN L. LEONOR, ALSO KNOWN AS JUAN ARMAND, APPELLANT.

638 N.W.2d 798

Filed February 1, 2002.    No. S-00-1318.

Anthony S. Troia and Jason E. Troia, of Troia Law Offices, for appellant.

Don Stenberg, Attorney General, and Susan J. Gustafson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.
## I. NATURE OF CASE

The appellant, Juan L. Leonor, was charged by amended information in the Douglas County District Court with first degree assault and use of a deadly weapon to commit a felony for his actions on November 20, 1999. He was charged in a separate case with two counts of second degree murder and two counts of use of a deadly weapon to commit a felony for his actions on November 22, 1999. After a consolidated trial, Leonor was found guilty on all counts. He was sentenced to serve prison terms of 20 years to life on each second degree murder count, 5 to 10 years on each of the three use of a deadly weapon to commit a felony counts, and 5 to 10 years on the first degree assault count, all to be served consecutively. Leonor appeals his convictions and sentences, assigning as error insufficiency of the evidence and excessive sentences. We affirm.

## II. BACKGROUND

### 1. NOVEMBER 20, 1999, INCIDENT

On November 20, 1999, Omaha police officer Angela Baker was called to the area of 21st and Q Streets in Omaha, at approximately 12:51 a.m. The nature of the call was a shooting at the La Loma Cafe, where it was believed that a Hispanic male had been shot in the leg. The victim was identified as Jose Silva, a member of the "Lomas XIII" street gang.

Silva testified that he was with his girl friend, Rhonda Ponce, at the La Loma Cafe sometime after midnight on November 20, 1999, when three individuals entered the restaurant. The three individuals, one of whom he identified as Rodolfo Chavez, a member of the "Surenos" street gang, got their food and left. Three to five minutes after Chavez and his companions left the restaurant, Silva heard gunshots coming from his left, near the front door. He jumped up, covered Ponce, threw her down on the floor, and got down on the floor himself. He realized that he had been shot only after he hit the floor. It was stipulated at trial that the wounds involved a substantial risk of death and a substantial risk of permanent disfigurement.

Two persons who were with Leonor that evening testified that they saw Leonor shoot into the La Loma Cafe. Chavez testified

that there was a discussion between Leonor and David Gonzales, also known as Creeper, in Chavez' presence about who was going to do the shooting. Leonor then shot three or four times through the window of the La Loma Cafe.

Gerardo Ortiz, who was also present, testified that he saw Leonor shoot through the window of the La Loma Cafe three or four times. Ortiz testified that the reason Leonor shot Silva was that a person named "Speedy," who was with Ortiz and Leonor, said Silva had shot his mother. Ortiz also testified that after the shooting, several persons, including Leonor, went to Ortiz' apartment. At that time, Leonor mentioned losing his pager. Officer Bruce Ferrell was one of the investigating officers at this shooting. Ferrell found a Uniden digital pager on the curb approximately 70 to 90 feet northeast of the La Loma Cafe. This pager was determined to be rented to Leonor.

## 2. NOVEMBER 22, 1999, INCIDENT

Officer Kimberly Woolery was working in the early morning hours of November 22, 1999, and received a call at 1:32 concerning shots fired in the area of 20th and Q Streets. En route, Woolery overheard a second call of a car accident in the area of 20th and N or M Streets. She went to the scene and observed that a black car had struck a light pole. She saw a single male occupant unconscious in the driver's seat. Woolery observed that the driver's-side window had been shattered, but held intact by the tinting, with a small hole just above the door lock. She opened the door and noticed a matching hole in the driver's upper back. From this, Woolery determined that the driver had been shot. She determined that the identity of the driver was Miguel Medrano. Medrano later died at the hospital where he had been taken.

Officer Craig Wylie was also on the scene that morning. At approximately 5 a.m., Wylie was approached by three teenagers who notified him of a body in the alley to the east. Wylie then went to the alley and noticed a Hispanic female. The victim was identified as Sylvia Valadez.

Witness Antoniette Gomez stated that she was with Valadez and Medrano on the evening of November 21, 1999, at the Guaca Maya restaurant. She testified that she, Valadez, and Medrano left the Guaca Maya restaurant at closing time and

went to Medrano's home. They remained at Medrano's for a few minutes, then Medrano and Valadez left together in Medrano's car. Gomez last saw Medrano and Valadez at approximately 1:30 a.m. driving toward 20th Street.

Dr. Jerry W. Jones performed autopsies on Valadez and Medrano. Valadez died as a result of blunt trauma injuries that were consistent with a car accident. According to Jones, Valadez probably remained alive and conscious for several minutes after the accident. The cause of Medrano's death was concluded to be a penetrating gunshot wound to the left side of the chest, which perforated the apex of the upper lobe of the left lung and severed the common carotid and the left subclavian arteries.

There were several individuals in the neighborhood who testified as to what they saw and heard in the early morning hours of November 22, 1999. Michael Jacobs testified that he saw two cars speeding north down 20th Street at around 1:30 a.m., with one man hanging out the passenger-side window of the car that was following the first car. He saw that man fire one shot, and he heard at least two other shots after the cars were no longer in his field of vision. Jacobs described the car from which shots were fired as dark colored with silver or chrome wheels. When shown a picture of Leonor's car, exhibit 64, Jacobs identified it as similar to or consistent with the car that gunshots were fired from.

Roy Nelson testified that he heard two or three gunshots, a "car scream around 20th and Q going north on 20th," with another car behind it, and three more gunshots. He testified that the gunshots were coming from the rear car, which he described as a dark sports car, possibly a Trans Am. Nelson was shown exhibit 64 and testified that it was very similar to the car he saw gunshots fired from on November 22, 1999.

Abel Diaz was standing outside of his car on 20th and N Streets and observed a black car being chased by a light brown car. He heard five or six gunshots and saw the shots coming from the passenger side of the second car, which was chasing the first car. Diaz then saw the first car crash into the light pole. Diaz was also shown exhibit 64 and stated that the taillights on the second car looked like the taillights on the car depicted in the exhibit.

Several of Leonor's fellow gang members testified as to what they observed on the morning of November 22, 1999. Ortiz

testified that he was with a group of people watching television at his apartment on the evening of November 21. Around 1 a.m. on November 22, Ortiz' roommate received a call from Leonor and Gonzales, who said that they were coming over to the apartment from the Guaca Maya restaurant. About 10 minutes later, Ortiz and the others at his apartment heard gunshots coming from 20th and Q Streets. Ortiz' apartment is located on the corner of 20th and P Streets. About 10 minutes after hearing the gunshots, Leonor and Gonzales arrived at the apartment. They were drunk and laughing. Leonor told Ortiz that he and Gonzales had shot someone who had thrown a Lomas gang sign at them. He also stated that he had been driving and that Gonzales did the shooting.

Jose Hernandez was present at Ortiz' apartment on the evening of November 21, 1999. He remembers Leonor and Gonzales calling at about 11 p.m. or 12 a.m. to say they were coming over. Hernandez later heard three to five gunshots coming from around 20th and Q Streets and went outside to see what had happened. Ortiz and his roommate went outside too. They could not see where the shots came from, so they went back inside the apartment. About 5 to 15 minutes later, Leonor and Gonzales appeared outside the apartment. Leonor was carrying Gonzales, who was very intoxicated, and Gonzales was waving around a 9-mm gun, pointing it at Hernandez.

Leonor told Hernandez that the gun was not loaded because the last bullet had been fired. Once they got into the apartment, Leonor explained that they were coming from the Guaca Maya restaurant and that Gonzales "wanted something to go on with his gun." They were driving down Q Street, and Gonzales shot his gun two or three times. Leonor then told Hernandez that he and Gonzales saw a bald-headed man in a black car, who got "paranoid" when they all looked at each other at a four-way stop sign. Leonor got in front of the bald man's car to block his way. When the bald man tried to reverse, Leonor reversed and got right beside him. Gonzales then shot his gun at the man. Leonor next raced the bald man's car down the street until it crashed.

Arthur Carter testified that he had been incarcerated with Leonor in the Douglas County Correctional Center in February 2000. According to Carter, Leonor told him about the shooting

of Medrano's car because he was seeking Carter's advice as to possible sentences. Leonor told Carter that he and another person were out "looking for the enemies," when they saw a black car and began to follow it "aggressively." Leonor also told Carter that he was driving and that his friend was in the passenger seat. Leonor's friend began shooting at the other car while at an intersection. They chased the car south, shooting at it, until the car hit a pole.

Omaha Police Department crime laboratory technician Daniel Bredow testified that the shell casings collected from the shootings of Silva and Medrano matched. They were both 9-mm casings which had been fired from the same weapon. Ortiz testified that the 9-mm gun belonged to Leonor.

For his actions on November 22, 1999, Leonor was charged in docket 149, page 834, with counts I and II, murder in the second degree, Class I felonies in violation of Neb. Rev. Stat. § 28-304(1) (Reissue 1995). He was also charged with counts III and IV, use of a deadly weapon to commit a felony, Class II felonies in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1995). For his actions on November 20, 1999, Leonor was charged in docket 149, page 835, with count I, assault in the first degree, a Class III felony in violation of Neb. Rev. Stat. § 28-308(1) (Reissue 1995). He was also charged with count II, use of a deadly weapon to commit a felony. After being convicted on all counts in a consolidated trial, Leonor moved for a new trial in both cases. The trial court overruled the motions. Leonor was sentenced to prison for 20 years to life on each second degree murder charge, 5 to 10 years on each use of a deadly weapon to commit a felony charge, and 5 to 10 years on the first degree assault charge, all to be served consecutively.

### III. ASSIGNMENTS OF ERROR

Leonor assigns as error and argues that (1) the evidence adduced at trial was insufficient to find him guilty of any of the crimes charged beyond a reasonable doubt and (2) the trial court abused its discretion by imposing upon him an excessive sentence.

### IV. STANDARD OF REVIEW

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for

an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001); *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000).

An appellate court will not disturb sentences within statutory limits, unless the district court abused its discretion in establishing the sentences. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

#### (a) November 20, 1999

As to the conviction stemming from the shooting of Silva on November 20, 1999, Leonor argues that the evidence was insufficient to convict him beyond a reasonable doubt.

On appellate review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Jackson*, 258 Neb. 24, 601 N.W.2d 741 (1999). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McLemore, supra*; *State v. Rieger, supra*.

Moreover, in determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Jackson, supra*. On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994), citing *State*

*v. Cook*, 244 Neb. 751, 509 N.W.2d 200 (1993), and *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992).

■ Section 28-308(1) states that "[a] person commits the offense of assault in the first degree if he intentionally or knowingly causes serious bodily injury to another person." When the sufficiency of the evidence as to criminal intent is questioned, " 'the law is settled that independent evidence of specific intent is not required. The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.' " *State v. Tweedy*, 224 Neb. 715, 720, 400 N.W.2d 865, 869 (1987), quoting *State v. Thielen*, 216 Neb. 119, 342 N.W.2d 186 (1983).

Section 28-1205(1) states:

> Any person who uses a firearm . . . to commit any felony which may be prosecuted in a court of this state or who unlawfully possesses a firearm . . . during the commission of any felony which may be prosecuted in a court of this state commits the offense of using a deadly weapon to commit a felony.

Viewing the evidence in a light most favorable to the State demonstrates that there is ample evidence supporting Leonor's convictions for his actions on November 20, 1999. Both Chavez and Ortiz testified that they actually saw Leonor shoot through the window of the La Loma Cafe early in the morning on November 20. No witnesses refuted that testimony. Therefore, we determine that the State produced sufficient evidence that the jury could have found, beyond a reasonable doubt, that Leonor was guilty of the crimes of first degree assault and use of a deadly weapon to commit a felony in the November 20 incident.

### (b) November 22, 1999

Leonor claims that the evidence was also insufficient to prove that he committed or aided and abetted in the commission of the murders of Medrano and Valadez on November 22, 1999. Once again, an appellate court looks at the evidence to determine whether a rational juror in this case could find that Leonor was guilty of two counts of second degree murder. We will address the two counts of use of a weapon later in this opinion.

While no eyewitnesses placed Leonor by name in the car that was doing the chasing and from which the shots were being fired, there was the following evidence:

(1) Witnesses Jacobs and Nelson identified the car doing the chasing and from which the shots were fired as being similar to Leonor's car.

(2) Witness Gomez was with Medrano and Valadez at the Guaca Maya restaurant. She testified Medrano and Valadez left together in Medrano's car at 1:30 a.m., driving toward 20th Street. A police officer, Woolery, at 1:32 a.m., received a radio call, and on her way to answer this radio call, came upon the accident where Medrano's car had hit the pole. Therefore, this testimony places Valadez in Medrano's car.

(3) The pathologist, Jones, testified that Valadez died as a result of blunt trauma from the car accident.

(4) Jones testified that Medrano's death was from a gunshot wound to the left side of his chest.

(5) The gun which shot Medrano was the same gun that had shot Silva in the November 20, 1999, incident.

(6) Fellow gang member, Ortiz, testified that in the early morning hours of November 22, 1999, he was in his apartment and heard gunfire from the corner of 20th and Q Streets. Ortiz testified that about 10 minutes later, Leonor and Gonzales arrived at his apartment and that Leonor told Ortiz that he and Gonzales had shot someone who had thrown a Lomas gang sign at them. Leonor said he was driving and Gonzales was shooting.

(7) Hernandez, who was also present in Ortiz' apartment in the early morning hours of November 22, 1999, recalled hearing gunshots from 20th and Q Streets. Hernandez testified that about 5 to 15 minutes later, Leonor and Gonzales arrived at the apartment, and that Gonzales was waving around a 9-mm gun. Leonor stated the gun was not loaded because the last bullet had been fired. Leonor told Hernandez that he and Gonzales were driving down Q Street, that Gonzales had shot his gun two or three times, and that they saw a bald-headed man in a black car who got paranoid when they all looked at each other at a four-way stop sign. Leonor got in front of the bald man's car to block his way. When the bald man tried to reverse, Leonor reversed and got right beside him. Gonzales then shot his gun

at the man. Leonor next raced the bald man's car down the street until it crashed.

(8) Carter testified that he had been incarcerated with Leonor in the Douglas County Correctional Center in February 2000, when Leonor told him about shooting at Medrano's car. Leonor told Carter that he and another person were out "looking for the enemies" when they saw a black car and began to follow it "aggressively." Leonor stated that he was driving and that his friend was in the passenger seat. His friend began shooting at the other car while at an intersection. They chased the car south, shooting at it, until the car hit a pole.

■ While the information did not describe Leonor as an aider and abettor, Neb. Rev. Stat. § 28-206 (Reissue 1995) provides that a person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he or she were the principal offender. This same language was used in the prior aider and abettor statute. See Neb. Rev. Stat. § 28-201 (Reissue 1975). An information charging an aider and abettor of a crime need not include any additional facts than those necessary to charge the principal of the crime. *Neal v. Grammer,* 769 F. Supp. 1523 (D. Neb. 1991). See, also, *Burnell v. State,* 159 Neb. 349, 66 N.W.2d 838 (1954).

■ Section 28-304(1) states that "[a] person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation." Section 28-206 states that "[a] person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if the aider or abettor knew that the perpetrator of the act possessed the required intent or that the aider or abettor himself or herself possessed the required intent. *State v. Becerra,* 261 Neb. 596, 624 N.W.2d 21 (2001), citing *State v. Sims,* 258 Neb. 357, 603 N.W.2d 431 (1999), *State v. Arnold,* 253 Neb. 789, 572 N.W.2d 74 (1998), and *State v. Mantich,* 249 Neb. 311, 543 N.W.2d 181 (1996).

■ Aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an

aider or abettor. No particular acts are necessary, however, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *State v. Ramsay*, 257 Neb. 430, 598 N.W.2d 51 (1999), citing *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998), *State v. Arnold, supra*, and *State v. Mantich, supra*. Yet, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory. *State v. Ramsay, supra*; *State v. Larsen, supra*; *State v. Arnold, supra*.

■ One who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act. *State v. Mantich, supra*.

We determine that the evidence was sufficient to support the guilty verdicts. The evidence showed that Leonor told Ortiz that he and Gonzales had shot someone who had thrown a Lomas gang sign at them; Leonor told Carter in the Douglas County jail that he and another person were out "looking for the enemies" when they began to follow the victim's car aggressively and chased the victim's car, shooting at it, until the victim's car hit a pole. Therefore, Leonor is guilty as an aider and abettor in the deaths of both Medrano and Valadez.

### 2. USE OF DEADLY WEAPON

■ The evidence was sufficient to convict Leonor of both counts of use of a deadly weapon to commit a felony, even if Leonor never fired a shot. *State v. Mantich, supra*, holds that a defendant can be convicted of the use of a deadly weapon charge under an aiding and abetting theory. In that case, the defendant was found guilty of felony murder on the theory that he aided and abetted the kidnapping and robbery of the victim. We held that as a natural and probable consequence of the kidnapping and robbery, the defendant could properly be convicted of using a firearm to commit a felony even if the jury believed that he was unarmed.

In *State v. Johnson*, 240 Neb. 924, 485 N.W.2d 195 (1992), the evidence was deemed sufficient to find the defendant guilty

of use of a knife to commit a felony and first degree assault, despite the fact that she did not use a knife, when she and her boyfriend accosted the victim when he was coming out of a bar. The defendant struck the victim from behind and pulled his jacket over his head, thereby immobilizing his arms over his head, which allowed the defendant's boyfriend to repeatedly stab the victim with a knife.

Similarly, Leonor drove the car in a manner which enabled Gonzales to repeatedly shoot at Medrano's car by blocking Medrano in at the intersection and then chasing Medrano down the street. Leonor aided and abetted the second degree murders of Medrano and Valadez, and the crime of use of a deadly weapon to commit a felony is a natural and probable consequence of those crimes. Therefore, we conclude that the evidence is sufficient to convict Leonor of the use of a deadly weapon to commit a felony charges.

We determine that the evidence adduced at trial, when viewed and construed in a light most favorable to the State, was sufficient to support Leonor's convictions on all charges stemming from his actions on November 22, 1999.

### 3. EXCESSIVE SENTENCES

Leonor next argues that his sentences represented an abuse of discretion. According to Leonor, the facts of the case should cause a sentencing court to pause and consider whether he truly committed the crimes alleged. Leonor claims that the trial court "simply did not note the suspect evidence offered in the case." Brief for appellant at 19. Leonor argues, therefore, that the trial court abused its discretion and that the sentences should be either vacated or reduced.

In *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001), we held that an appellate court will not disturb sentences within statutory limits, unless the district court abused its discretion in establishing the sentences. An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001). Additionally:

> In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience,

and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Urbano*, 256 Neb. 194, 216, 589 N.W.2d 144, 159 (1999). Furthermore, in considering a sentence, a court is not limited in its discretion to any mathematically applied set of factors.

The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *State v. Kunath*, 248 Neb. 1010, 540 N.W.2d 587 (1995).

These crimes involved two separate violent and senseless incidents, and as a result, one person was injured and two people are dead. Leonor's sentences are within the statutory limitations. The trial court relied on the senselessness of Leonor's actions and the detrimental effect of "urban terrorism" that results from gang violence to justify its order.

The sentences are within statutory guidelines and were not an abuse of discretion. We conclude, therefore, that the sentences are not excessive.

## VI. CONCLUSION

For the aforementioned reasons, we affirm the holding of the trial court. The evidence, when viewed in a light most favorable to the State, was sufficient to convict on all counts. Additionally, the sentences imposed on Leonor were not an abuse of discretion when taking into account the circumstances surrounding his crimes.

AFFIRMED.