726 N.W.2d 576 (2007)
15 Neb. App. 323
In re Interest of HAILEY M., a child under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v.
Tammy C., appellee and cross-appellant, and
Theodore M., intervenor-appellant and cross-appellee.
No. A-06-692.
Court of Appeals of Nebraska.
January 16, 2007.
*579 Steve Williams, of Recknor, Williams & Wertz, Lincoln, for intervenor-appellant.
Gary Lacey, Lancaster County Attorney, Michelle A. Paxton, Lori A. Maret, and Henry L. Wiedrich, Senior Certified Law Student, for appellee State of Nebraska.
Jason L. Scott and Mark Buckwalter, Senior Certified Law Student, of Pierson, Fitchett, Hunzeker, Blake & Katt, for appellee Tammy C.
SIEVERS, CARLSON, and CASSEL, Judges.
CARLSON, Judge.

INTRODUCTION
Theodore M. appeals from an order of the juvenile court of Lancaster County overruling his motion for visitation with his daughter Hailey and his request to place Hailey with relatives. Tammy C., Hailey's mother, cross-appeals from an order adjudicating *580 Hailey to be a child within the meaning of Neb.Rev.Stat. § 43-247(3)(a) (Reissue 2004) and terminating Tammy's parental rights to Hailey. The court also found that the State is not required to use reasonable efforts to reunify Hailey with Tammy. For the reasons set forth below, we affirm.

BACKGROUND
The record shows that Hailey was born to Theodore and Tammy on October 29, 2005, in Lincoln, Nebraska. The State removed Hailey from Tammy's care on October 30.
On November 17, 2005, the State filed a second amended petition stating that Hailey is a child as defined by § 43-247(3)(a) in that Hailey lacks proper parental care by reason of the faults or habits of Tammy. Specifically, the petition alleged that on November 28 or 29, 1996, Tammy committed felony child abuse resulting in serious bodily injury to another one of her children, Christopher C., born August 7, 1995. The State alleged that these circumstances place Hailey at risk of harm. The State requested an order eliminating the requirement for reasonable efforts to "preserve and reunify [Hailey] with [Tammy]," alleging that Tammy committed the first or second degree murder or voluntary manslaughter of Christopher; aided or abetted, attempted, conspired, or solicited to commit the murder of Christopher; aided or abetted the voluntary manslaughter of Christopher; committed a felony assault of Christopher which resulted in serious bodily injury to Christopher; or aided or abetted such a felony assault of Christopher.
The State also sought termination of Tammy's parental rights under Neb.Rev. Stat. § 43-292(2) and (10) (Reissue 2004). Specifically, the State alleged that Tammy had substantially and continuously or repeatedly neglected and refused to give one of Hailey's siblings necessary care and protection and that, presumably on November 28 or 29, 1996, and against Christopher, Tammy committed the murder or voluntary manslaughter of another of her children; aided or abetted, attempted, conspired, or solicited to commit the murder of such child; aided or abetted the voluntary manslaughter of such child; or committed a felony assault of such child which resulted in serious bodily injury. The State also alleged that termination of Tammy's parental rights is in Hailey's best interests.
On November 23, 2005, Theodore filed a motion for leave to intervene, stating that he is Hailey's biological father. The trial court granted Theodore's motion. Theodore also filed a motion seeking visitation with Hailey which the court set for hearing. After the hearing, the court overruled that motion, finding that because Theodore is incarcerated, visitation between Hailey and Theodore is not in Hailey's best interests.
On April 17, 2006, Theodore filed another motion requesting visitation with Hailey and further requesting that the court place Hailey with one of three people. A hearing on Theodore's motion was held on May 23. At that hearing, Erin Bader, a protection and safety worker with the Nebraska Department of Health and Human Services (Department), testified that she opposed visitation between Theodore and Hailey due to Theodore's continued incarceration and the fact that Theodore's expected release date is not until 2013.
Bader also testified that Theodore had provided her with the names of several people with whom Hailey could be placed. Bader testified that the Department ruled out two of the people Theodore listed but was pursuing placement of Hailey with *581 Theodore's sister. Bader testified that the Department's policy is to place a child with relatives as long as a relative completes a satisfactory background check and a home study. Bader testified that as long as Theodore's sister met these requirements and Bader's supervisor approved, Hailey would be placed with Theodore's sister. Bader testified that she had completed her paperwork, but was waiting on the results of the sister's home study. Bader testified that it "takes quite a bit of time" to get such results. The court then overruled Theodore's motion for a change in Hailey's placement as well as Theodore's request for visitation.
Hearings on Hailey's adjudication, the termination of Tammy's parental rights, and the State's motion to eliminate the requirement of reasonable efforts to reunify were held on April 6, 7, and 13, 2006. At the April 6 hearing, Tammy testified that she was currently residing at "the Lancaster County Correctional Facility" and had been there since March 28 because of her conviction for possession of a controlled substance and her 90-day sentence. Tammy testified that that offense occurred in July 2005.
Tammy testified that besides Hailey and Christopher, she has three other children, Ashley, born November 26, 1990; Kyle, born April 29, 1992; and Luke, born May 11, 1994. Tammy testified that the State removed Ashley from her care when Ashley was 3 or 4 months old because Ashley's father was allegedly abusing Ashley.
Tammy testified that Ashley's father was abusive toward Tammy and that to protect Ashley, she allowed her parents to obtain guardianship of Ashley. Tammy testified that as of the time of trial, Ashley had never been returned to her care but she still visited Ashley.
Tammy testified that Ashley and Kyle have the same father and that Kyle and Ashley's paternal grandmother "kidnapped" Kyle when he was approximately a year old. Tammy testified that a hearing was subsequently held regarding Kyle's custody and that the judge decided Kyle and Ashley's grandmother could take better care of Kyle than Tammy could. Tammy testified that although she used to have visitation with Kyle, she had not seen Kyle in a few years.
Tammy testified that she placed Luke for adoption because she was young, single, and financially unable to support him. Tammy testified that Christopher was never removed from her care, but died in her care when he was 15 months old.
Tammy testified that she and Christopher lived in an apartment together. Tammy testified that in September 1996, she began dating Harold T., and that they started spending the night at each other's home in October. Tammy testified that around November 15, Christopher lost a tooth. Tammy testified that she learned of this fact when Harold told her that Christopher's sheets needed to be changed because there was blood on Christopher's sheets. Tammy testified that Harold claimed not to know how Christopher had lost his tooth. Tammy testified that because children typically do not lose a tooth at 15 months of age, she made a doctor's appointment for Christopher.
Tammy testified that after Christopher's doctor's visit on November 20, 1996, he was admitted to a hospital for as much as 4 days because he had developed an infection in his mouth. Tammy testified that soon afterward, Child Protective Services contacted her and informed her that it was attempting to put Christopher in protective custody because its personnel thought that he was being abused. Tammy testified that Christopher was allowed to leave the hospital with her and that she and Christopher stayed at different residences, *582 including Harold's, in order to hide, "[i]n a sense," from Child Protective Services. Tammy testified that she did not believe that Christopher was "in a bad situation." Tammy testified that Christopher's mouth continued to heal after he got out of the hospital.
Tammy testified that on November 28, 1996, which was Thanksgiving, she was staying at Harold's with Christopher. Tammy testified that that morning, she left Christopher with Harold and went to pick up Kyle for visitation in Iowa. Tammy testified that she returned to Harold's a couple of hours later and was told Christopher's face had been burned. Harold told her initially that Christopher had "looked into the heater" and later that Christopher had fallen into it. Tammy testified that she believed Harold when he told her Christopher's burns were an accident and that she had no suspicions otherwise. Tammy testified that Harold had physically assaulted Christopher only once before.
Tammy testified that she thought about taking Christopher to the doctor for his burns, but that she decided not to because she knew that if she did, the Department would have grounds to remove Christopher from her care.
Tammy testified that after she observed Christopher's burns, she went to her parents' house for Thanksgiving and stayed there several hours. Tammy stated that she left her parents' home in the early evening and returned Kyle to Iowa, but that before doing so, she dropped Christopher off at Harold's. Tammy testified that she returned about an hour later. Tammy testified that later that same evening, Harold went into Christopher's room to change his diaper and she heard a "really soft thump" and Christopher started to cry. Tammy testified that she heard Harold say, "`Oh, sorry, sorry'" and that Harold later told her that he had "bumped [Christopher] or somethin[g]."
Tammy testified that the next morning, she went to wake Christopher up and found that he was not breathing. Tammy stated that since Harold did not have a telephone, she had Harold take her to a pay telephone where she called her mother. The record shows that Harold dropped Tammy and Christopher off at Tammy's home, her mother came over, and Tammy and her mother then took Christopher to a hospital, where he was pronounced dead.
Tammy testified that at the time of trial, she had her own apartment and a full-time job that she had held since December 2005. Tammy testified that she is willing to do whatever it takes to get Hailey back and that she has had no contact with Harold since Christopher's death.
The autopsy photographs of Christopher's face were entered into evidence by the State and showed multiple severe burn marks on Christopher's forehead, cheeks, and nose as well as extreme redness and swelling around Christopher's mouth and chin. These photographs also show burns on Christopher's arms and hands. The autopsy states that Christopher's burn marks were consistent with someone's forcefully holding Christopher's face against a heating vent. Besides these burns, the autopsy showed that Christopher sustained numerous other injuries including contusions to his head, face, neck, and abdomen, in addition to four hemorrhages in his scalp area. The autopsy shows that Christopher died as a result of brain swelling caused by blunt force trauma to his head.
The record shows that in December 1996, the State charged Tammy with one count of manslaughter and two counts of child abuse. Tammy later entered into a *583 plea agreement in which she would plead guilty to one count of child abuse, a Class III felony. The charge to which Tammy pled stated that on November 28, 1996, between midnight and 1 p.m. in Otoe County, Nebraska, Tammy "did then and there knowingly or intentionally cause or permit a minor child, Christopher . . . to be: (a) placed in a situation that endangered his life or health; or (b) cruelly confined or cruelly punished; or (c) deprived of necessary care; and [this] resulted in serious bodily injury to Christopher. . . ."
In February 1998, the trial court sentenced Tammy to 5 to 12 years in prison. Harold was also charged in relation to Christopher's death and served time for abusing Christopher. The record shows that Tammy received parole in November 2002 and that her parole ended in March 2003.
Two protection and safety workers with the Department, Darci Poland and Valerie Hinrichs, testified in favor of terminating Tammy's parental rights to Hailey. Poland testified that she had contact with Tammy and Christopher in 1996 after the Department received an anonymous call on November 14 expressing concern over Christopher's health. Poland testified that she visited Tammy at home on November 18 and that Christopher was with Tammy. Poland testified that the left side of Christopher's mouth was red, swollen, and infected; his left eye was matted, red, and bruised; and he had a sore behind his left ear.
Poland testified that Tammy told her that she had a doctor's appointment for Christopher scheduled for later that day. Poland testified that after Christopher's appointment, she called the doctor's office and learned that Christopher had been hospitalized and would remain in the hospital for the next few days. Poland testified that after Christopher was discharged on November 21, 1996, she attempted to visit Tammy at home on November 24. Tammy was not there, so she went back on November 25 and found Tammy and Christopher at home. Poland testified that Christopher appeared to be significantly better.
Poland testified that she set up an appointment for an intensive family preservation team to visit Tammy on November 27, 1996, and that Tammy kept that appointment. Poland testified that she and the team visited Tammy on November 27 and that Christopher appeared to be doing well. Poland testified that Christopher also had a followup appointment at the doctor's office on that same date and that the doctor did not relay any concerns regarding Christopher's health.
Poland testified that Tammy never mentioned Harold's name to her, even though she asked Tammy if she had a boyfriend or if someone else provided care for Christopher. Poland testified that she had formed an opinion as to whether it is in Hailey's best interests to terminate Tammy's parental rights because of the case involving Christopher, but she was prevented by objection from stating that opinion.
Hinrichs testified that she was assigned to do the investigation or initial assessment on Hailey. Hinrichs testified that Tammy had not had a consistent place to live for an extended period of time in addition to the fact that Tammy was incarcerated for several years. Hinrichs testified that adoption is in Hailey's best interests because there are no services the Department can offer Tammy to provide for Hailey's safety and well-being, based upon Tammy's prior contacts with the Department and Tammy's criminal case involving Christopher. Hinrichs testified that she has not seen any evidence demonstrating *584 a change in Tammy's lifestyle allowing Tammy to provide for Hailey's safety and well-being. Hinrichs stated that Hailey's current foster parents expressed a desire "to provide for her long term."
In an order filed May 26, 2006, the trial court found that Hailey is a child as defined by § 43-247(3)(a) because Tammy's conduct as it related to Christopher was of such a nature as to place Hailey at risk of harm. The trial court stated that Tammy either was aware that Harold was inflicting injury upon Christopher or should have been aware that this was occurring.
Acknowledging the State's assertion that reasonable efforts to reunify Hailey with Tammy would be contrary to Hailey's best interests and would be contrary to the paramount concern of Hailey's health and safety, the court found by clear and convincing evidence that the requirement for reasonable efforts to "preserve and reunify [Hailey] with [Tammy]" should be eliminated because Tammy committed the first or second degree murder or voluntary manslaughter of Christopher; aided or abetted, attempted, conspired, or solicited to commit the murder of Christopher; aided or abetted the voluntary manslaughter of Christopher; committed a felony assault of Christopher which resulted in serious bodily injury to Christopher; or aided or abetted such a felony assault of Christopher.
The court further found by clear and convincing evidence that Tammy's parental rights should be terminated under § 43-292(2) and (10) because Tammy has substantially and continuously or repeatedly neglected and refused to give a sibling of Hailey's, Christopher, necessary parental care and protection and because Tammy had committed the murder or voluntary manslaughter of Christopher; aided or abetted, attempted, conspired, or solicited to commit the murder of Christopher; aided or abetted the voluntary manslaughter of Christopher; or committed a felony assault that resulted in serious bodily injury to Hailey or Christopher. The court also found that termination of Tammy's parental rights is in Hailey's best interests. Theodore appeals, and Tammy cross-appeals.

ASSIGNMENTS OF ERROR
In his appeal, Theodore contends that the trial court erred in (1) overruling his motion for visitation with Hailey and (2) failing to order the Department to consider "any and all relative placements for Hailey." In her cross-appeal, Tammy argues that the trial court erred in finding that (1) Hailey is a child as defined in § 43-247(3)(a), (2) termination of Tammy's parental rights is warranted under § 43-292(2) and (10), (3) termination of her parental rights is in Hailey's best interests, and (4) the State is not required to use reasonable efforts to reunify her with Hailey.

STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. In re Interest of B.R. et al., 270 Neb. 685, 708 N.W.2d 586 (2005). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. Id.

ANALYSIS
Theodore's Motion for Visitation.
Theodore argues that the trial court erred in overruling his motion for visitation with Hailey. In November 2005, Theodore filed a motion seeking visitation *585 with Hailey which the court set for hearing. After the hearing, the court overruled the motion, finding that Hailey's visitation with Theodore, who was currently incarcerated, was not in Hailey's best interests.
On April 17, 2006, Theodore filed another motion requesting visitation with Hailey. The record shows that Theodore remained incarcerated at that time. At a hearing, the State presented testimony opposing visitation for Theodore due to his continued incarceration and the fact that Theodore's expected release date is not until 2013. The trial court then overruled this motion for visitation on May 26.
In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. In re Interest of Dakota L. et al., 14 Neb.App. 559, 712 N.W.2d 583 (2006).
In the instant case, we have noted that May 26, 2006, is not the first time the court overruled a motion by Theodore for visitation with Hailey. The court denied Theodore's first motion for visitation in January and that order clearly affected one of Theodore's substantial rights. Theodore did not file an appeal from that order, but subsequently filed the second motion for visitation, which the trial court also overruled. It is from this second order that Theodore appeals.
Therefore, this appeal is simply an attempt to appeal after the time for an appeal has expired. See, e.g., In re Interest of Joshua M. et al., 251 Neb. 614, 558 N.W.2d 548 (1997); Federal Land Bank v. McElhose, 222 Neb. 448, 384 N.W.2d 295 (1986); In re Interest of Zachary L., 4 Neb.App. 324, 543 N.W.2d 211 (1996). Although dispositional orders of a juvenile court are final, appealable orders, if an order is not new, but merely a continuation of a previous order, it does not extend the time for appeal. In re Interest of Andrew H. et al., 5 Neb.App. 716, 564 N.W.2d 611 (1997); In re Interest of Zachary L., supra.
Given that the court's second order denying Theodore visitation is merely a continuation of the original order, we conclude that this order did not affect one of Theodore's substantial rights, and therefore, we lack jurisdiction to consider Theodore's claim that the trial court erred in denying him visitation with Hailey. This assignment of error is without merit.
Theodore's Motion Regarding Hailey's Placement.
Theodore also argues that the trial court erred in failing to order the Department to consider any and all relative placements for Hailey. Hearing on Theodore's motion requesting that the court place Hailey with one of three people was held on May 23, 2006.
Bader, a protection and safety worker with the Department, testified that Theodore had provided her with the names of several people with whom Hailey could be placed. Bader testified that the Department ruled out two of the people Theodore listed but was pursuing placement of Hailey with Theodore's sister. Bader testified that the Department's policy is to place a child with relatives as long as a relative completes a satisfactory background check and a home study. Bader testified that as long as Theodore's sister meets these requirements and her supervisor approves, Hailey will be placed with Theodore's sister. Bader testified that she had completed her paperwork, but was waiting on the results of Theodore's sister's home study. Bader testified that it "takes quite a bit of time" to get such results. The court then overruled Theodore's motion.
*586 After reviewing the record, we conclude that given the evidence that the Department was in the process of considering Theodore's sister as a placement for Hailey, the trial court did not err in failing to order the Department to consider "any and all relative placements for Hailey."
Tammy's Cross-Appeal From Hailey's Adjudication.
In her cross-appeal, Tammy argues that the trial court erred in finding that Hailey is a child as defined in § 43-247(3)(a). In its petition, the State alleged that Hailey is a child as defined by § 43-247(3)(a) in that Hailey lacks proper parental care by reason of the faults or habits of Tammy. Specifically, the petition alleged that on November 28 or 29, 1996, Tammy committed felony child abuse resulting in serious bodily injury to Christopher. The State alleged that these circumstances place Hailey at risk of harm.
At the adjudication stage of a dependency proceeding, for a juvenile court to assume jurisdiction of minor children, the State must prove the allegations of the petition by a preponderance of the evidence. See In re Interest of B.R. et al., 270 Neb. 685, 708 N.W.2d 586 (2005).
The record shows that in December 1996, the State charged Tammy with one count of manslaughter and two counts of child abuse regarding Christopher. Tammy later entered into a plea agreement in which she would plead guilty to one count of child abuse, a Class III felony. The charge to which Tammy pled stated that on November 28, 1996, between midnight and 1 p.m. in Otoe County, Tammy "did then and there knowingly or intentionally cause or permit a minor child, Christopher . . . to be: (a) placed in a situation that endangered his life or health; or (b) cruelly confined or cruelly punished; or (c) deprived of necessary care; and [this] resulted in serious bodily injury to Christopher. . . ." In February 1998, the trial court sentenced Tammy to 5 to 12 years in prison for abusing Christopher.
Tammy argues that the court erred in finding that Hailey is a child as defined by § 43-247(3)(a) because Tammy's actions in 1996 toward Christopher do not place Hailey at risk of harm. We disagree. While Tammy's conduct in relation to Christopher occurred 9 years prior to Hailey's birth, the record shows that Tammy's conviction was for an extremely grave charge, that of felony child abuse resulting in serious injury to Christopher.
Therefore, although a number of years have passed since Tammy's conviction, the fact that the standard to adjudicate is preponderance of the evidence leads us to the conclusion that the trial court did not err in finding that Hailey is a child as defined by § 43-247(3)(a). The trial court was correct in finding that Tammy's conduct as it related to Christopher was of such a nature as to place Hailey at risk of harm.
Termination of Tammy's Parental Rights.
Tammy also argues that the trial court erred in terminating her parental rights to Hailey and in finding that such termination is in Hailey's best interests. The State sought termination of Tammy's parental rights under § 43-292(2) and (10).
Section 43-292(2) states that parental rights may be terminated when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection, while § 43-292(10) allows termination if a parent has (a) committed murder of another child of the parent; (b) committed voluntary manslaughter of another child of the parent; (c) aided or abetted, attempted, conspired, or solicited to commit murder, *587 or aided or abetted voluntary manslaughter of the juvenile or another child of the parent; or (d) committed a felony assault that resulted in serious bodily injury to the juvenile or another minor child of the parent. The standard for termination of parental rights is clear and convincing evidence. See In re Interest of Chloe L. & Ethan L., 14 Neb.App. 663, 712 N.W.2d 289 (2006).
As to the termination of Tammy's parental rights under § 43-292(10), aiding and abetting requires some participation in a criminal act which must be evidenced by word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor. No particular acts are necessary, however, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. State v. Leonor, 263 Neb. 86, 638 N.W.2d 798 (2002).
Yet, evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory. Id. One who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act. Id.
The record in the instant case contains evidence to show that Tammy committed the offense of aiding or abetting or conspiring with Harold to kill Christopher. The record shows that Tammy committed the offense of aiding or abetting because she assisted or encouraged the murder or voluntary manslaughter of Christopher by placing Christopher in a situation that endangered his life. Tammy did so by leaving Christopher alone with Harold when she knew or should have known that Harold was abusing Christopher.
The record shows that there are two occasions prior to Christopher's death suggesting Harold's abuse of Christopher. First of all, in late October or early November 1996, Tammy was getting ready to leave Harold's residence and Christopher was crying. Tammy testified that as she was "getting [Christopher's] diaper bag put together," Christopher's cry changed, and that when she turned to see what was wrong, she saw Christopher reaching for his face. Tammy testified that she then asked Harold, who was nearby, what had happened and that Harold stated, "`Oh, well, I didn't realize he was that close to me and I accidentally hit his face.'"
Furthermore, Tammy testified that on approximately November 15, 1996, Harold came to Tammy and told her that he needed to change Christopher's sheets because one of Christopher's teeth fell out and Christopher's sheets were bloody. Harold did not tell Tammy how Christopher lost his tooth, claiming not to know. Tammy's mother testified that the loss of the tooth, or injury to Christopher's mouth occurred earlier, on either November 11 or November 12. Tammy testified that after this occurred, she made a doctor's appointment for Christopher because 15-month-old children generally do not lose their teeth.
The record shows that prior to Christopher's doctor's visit, Christopher grew very weak, his mouth became infected as a result of bacteria invading the lacerations in his mouth, and he became anemic. Additionally, Poland, one of the Department's protection and safety workers, testified that she visited Tammy at home in the early afternoon of November 18, 1996, and that Tammy was taking Christopher to the doctor later that day. Poland testified that the left side of Christopher's mouth was red, swollen, and infected; his left *588 eye was matted, red, and bruised; and he had a sore behind his left ear.
After seeing the doctor, Christopher was hospitalized for 4 days until his infection cleared up. During Christopher's hospitalization or shortly thereafter, the Department contacted Tammy's father and told him that its personnel were certain that Christopher was being abused and that they were attempting to remove Christopher from Tammy's care as a result. Tammy testified that she was aware of the Department's concerns, but did not believe that Christopher was in a bad situation. Poland testified that she spoke with her supervisor and the county attorney about filing a petition to adjudicate Tammy regarding Christopher under § 43-247(3)(a). Although Poland recommended that such a petition be filed, the county attorney determined not to and that Christopher would remain in Tammy's care and services would be provided to Tammy to assist her in caring for Christopher. It was later determined that the injury to Christopher's mouth was the result of blunt force trauma.
The record shows that after Christopher was released from the hospital, Christopher went back to live with Tammy, and that Tammy continued to date Harold and spend the night at Harold's residence. In fact, the evidence shows that if anything, Tammy may have increased the amount of time she spent at Harold's residence in order to, "[i]n a sense," hide from the Department so that its personnel could not remove Christopher from her care.
Tammy testified that on November 28, 1996, which was Thanksgiving, she was staying at Harold's with Christopher. Tammy testified that that morning, she left Christopher with Harold and went to pick up one of her other children, Kyle, for visitation. Tammy testified that she returned to Harold's residence a couple of hours later and was told Christopher's face had been burned. Harold told her initially that Christopher had "looked into the heater" and later that Christopher had fallen into the heater. Tammy testified that she thought about taking Christopher to the doctor for his burns, but that she decided not to because she knew that if she did, the Department would have grounds to remove Christopher from her care.
Tammy testified that after she observed Christopher's burns, she went to her parents' house for Thanksgiving with Christopher and stayed there several hours. Tammy stated that she left her parents' home in the early evening and returned Kyle to Iowa, but that before doing so, she dropped Christopher off at Harold's once again. Tammy testified that she returned about an hour later. Tammy testified that later that same evening, Harold went into Christopher's room to change his diaper and she heard a "really soft thump" and Christopher started to cry. Tammy testified that she heard Harold say, "`Oh, sorry, sorry'" and that Harold later told her that he had "bumped [Christopher] or somethin[g]."
Tammy testified that the next morning, she went to wake up Christopher and found that he was not breathing. After Tammy took Christopher to the hospital, he was pronounced dead. The autopsy photographs of Christopher's face entered into evidence by the State show multiple severe burn marks on Christopher's forehead, cheeks, and nose as well as extreme redness and swelling around Christopher's mouth and chin. These photographs also show burns on Christopher's arms and hands. The autopsy states that Christopher's burn marks were consistent with someone's forcefully holding Christopher's face against a heating vent. Besides these burns, the autopsy showed that Christopher *589 sustained numerous other injuries including contusions to his head, face, neck, and abdomen, in addition to four hemorrhages in his scalp area. The autopsy shows that Christopher died as a result of brain swelling caused by blunt force trauma to his head. It is impossible to conclude, given the extent of Christopher's injuries, that Christopher sustained all of these injuries on November 28, 1996, and that Tammy was unaware that Harold was inflicting these injuries.
Furthermore, we note that the felony child abuse charge which Tammy pled to stated that Tammy was guilty of child abuse given that on November 28, 1996, Tammy knowingly or intentionally caused or permitted Christopher to be either placed in a situation that endangered his life or health, cruelly confined or cruelly punished, or deprived of necessary care and that Tammy's actions resulted in serious bodily injury to Christopher.
We note that in 1998, Tammy was found guilty of felony child abuse because Tammy knowingly or intentionally caused or permitted Christopher to be placed in a situation that endangered his life. This record shows that Tammy knew or should have known that Harold was abusing Christopher and that despite this knowledge, Tammy left Christopher with Harold. As a result, Christopher suffered severe injuries which resulted in his death. Given these facts, we find that the trial court did not err in terminating Tammy's parental rights under § 43-292(10), because Tammy aided or abetted Christopher's murder or voluntary manslaughter by her actions.
Best Interests of Hailey.
Tammy argues that the trial court also erred in finding that the termination of her parental rights is in Hailey's best interests. Hinrichs testified that adoption is in Hailey's best interests because there are no services the Department can offer Tammy to provide for Hailey's safety and well-being, based upon Tammy's prior contacts with the Department and Tammy's criminal case involving Christopher. Hinrichs testified that she has not seen any evidence demonstrating a change in Tammy's lifestyle allowing Tammy to provide for Hailey's safety and well-being. The record shows that Hailey's foster parents expressed a desire "to provide for her long term."
We note that Hailey is Tammy's fifth child and that Tammy's track record with her children is not favorable. As to Tammy's first two children, the record shows that relatives have physical custody of both Ashley and Kyle. Tammy testified that the State removed Ashley from her care when Ashley was 3 or 4 months old because Ashley's father was allegedly abusing Ashley. Tammy testified that Ashley's father was abusive toward Tammy and that to protect Ashley, she allowed her parents to obtain guardianship of Ashley. Tammy testified that Kyle was also removed from her home and that at a subsequent hearing, the judge decided that Kyle and Ashley's grandmother could take better care of Kyle than Tammy could. The record shows that Tammy has visitation with Ashley, but had not seen Kyle in a few years. Tammy testified that she placed Luke for adoption because she was young, single, and financially unable to support him.
After being convicted of felony child abuse of Christopher in 1998, Tammy remained incarcerated until she received parole in 2002. Tammy was on probation until March 2003 and met Theodore at a work release center in 2003. Tammy became pregnant with Hailey in early 2005, and in July or August 2005, Tammy, while pregnant with Hailey, was charged with possession of a controlled substance. *590 Tammy was convicted of that offense and spent 90 days in jail in 2006.
Reviewing the record as a whole, including both Tammy's past behavior and her more recent behavior, we conclude that the trial court did not err in finding that the termination of Tammy's parental right is in Hailey's best interests.
Elimination of Requirement of Reasonable Efforts to Reunify.
Tammy also argues that the trial court erred in finding that the State was not required to use reasonable efforts to reunify Tammy with Hailey. The question arises by virtue of the language of Neb. Rev.Stat. § 43-283.01(4) (Reissue 2004), which states in relevant part:
Reasonable efforts to preserve and reunify the family are not required if a court of competent jurisdiction has determined that:
(a) The parent of the juvenile has subjected the juvenile to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse;
(b) The parent of the juvenile has (i) committed first or second degree murder to another child of the parent, (ii) committed voluntary manslaughter to another child of the parent, (iii) aided or abetted, attempted, conspired, or solicited to commit murder, or aided or abetted voluntary manslaughter of the juvenile or another child of the parent, or (iv) committed a felony assault which results in serious bodily injury to the juvenile or another minor child of the parent; or
(c) The parental rights of the parent to a sibling of the juvenile have been terminated involuntarily.
It is clear from looking at the language of § 43-283.01(4)(b)(iii) that this language mirrors that contained in § 43-292(10)(c). The juvenile court is a "court of competent jurisdiction" to make a determination regarding whether the exceptions under § 43-283.01(4)(b) apply to excuse reasonable efforts to reunify. See, In re Interest of Anthony V., 12 Neb.App. 567, 680 N.W.2d 221 (2004); In re Interest of Janet J., 12 Neb.App. 42, 666 N.W.2d 741 (2003), disapproved on other grounds, In re Interest of Jac'Quez N., 266 Neb. 782, 669 N.W.2d 429 (2003).
We have already found that the record supports a finding that Tammy aided or abetted, or attempted, conspired, or solicited to commit, the murder or voluntary manslaughter of Christopher. Therefore, the trial court did not err in finding that the State was not required to use reasonable efforts to reunify Tammy with Hailey.

CONCLUSION
After reviewing the record, we conclude that we lack jurisdiction to determine whether the trial court erred in overruling Theodore's motion for visitation with Hailey. The trial court did not err in failing to order the Department to consider "any and all relative placements" for Hailey. Similarly, as to Tammy's cross-appeal, the trial court did not err in finding that Hailey is a child as defined in § 43-247(3)(a) or in finding that termination of Tammy's parental rights to Hailey is warranted under § 43-292(10). Additionally, the trial court did not err in finding that the State is not required to use reasonable efforts to reunify Tammy with Hailey. Therefore, we affirm the trial court's order in its entirety.
AFFIRMED.